UNITED STATES of America, Plaintiff-Appellee,

v.

Claude John SCALLION, Raymond Lynn Buckelew, James Laney Jenkins and Judson Lee Drane, Defendants-Appellants.

No. 74–4246.

United States Court of Appeals, Fifth Circuit.

June 17, 1976.

Rehearings Denied Aug. 27, 1976.

Thomas W. Davenport, Jr., Monroe, La., for Scallion.

Thomas L. Robinson, Memphis, Tenn. (Court-appointed), for Buckelew & Jenkins.

Michael T. Pulaski, Alexandria, La. (Court-appointed), for Drane.

Donald E. Walter, U. S. Atty., Joseph S. Cage, Jr., Asst. U. S. Atty., Shreveport, La., Michael W. Farrell, Washington, D. C., for plaintiff-appellee.

Before BROWN, Chief Judge, and THORNBERRY, Circuit Judges, and MILLER,* Associate Judge.

MILLER, Associate Judge:

Appellants Buckelew, Jenkins, and Scallion were convicted in federal district court under 18 U.S.C. § 1343 of using interstate wire facilities (telephone) in carrying out a scheme to defraud certain Las Vegas, Nevada, hotel casinos. They were also convicted, along with James W. Graves, under 18 U.S.C. § 371 of conspiracy to violate 18 U.S.C. 1343 involving the same scheme.[1] Appellant Drane was convicted on an identical conspiracy count. The appeals are from these convictions.[2] We affirm.

Joint briefs have been filed by Buckelew and Jenkins, and separate briefs have been filed by Scallion and Drane. Their motions to adopt by reference all parts of each other's briefs have been granted. Appellant Drane waived his right to file a supplemental brief on alleged errors in the trial judge's ruling on his motion to recuse, ap-

---

* Of the U. S. Court of Customs and Patent Appeals, sitting by designation.

1. 18 U.S.C. § 1343 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 371 provides, in part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

2. The appeal of Graves from his conviction on the same conspiracy count as that of Buckelew, Jenkins, and Scallion has been dismissed without prejudice on motion of appellee alleging that Graves is a fugitive from justice.

parently relying on his affidavit filed in support of his motion.

## PROCEEDINGS BELOW

The indictment of Buckelew, Jenkins, Scallion, and Graves was filed October 12, 1973.[3] One count of the same indictment charged violation of 18 U.S.C. § 1343 by Gerald Lee Ray, who subsequently pleaded guilty and testified for the government. The indictment of Drane was filed January 25, 1974, and named Clyde Robert Rhoads as an unindicted coconspirator. However, Rhoads died in September of 1970.

Early in February of 1974, Buckelew, Jenkins, and Scallion moved for severance and separate trials. Buckelew and Jenkins cited the adverse pretrial publicity of defendant Graves. Scallion alleged that the defense and evidence to be offered by Graves would be totally inconsistent with the defense and evidence to be presented by him. The motions were denied on February 26.[4]

Buckelew also moved to transfer his case for trial from the Western District of Louisiana to another district, alleging "much unfavorable publicity in the newspapers and all other media," which motion was adopted by Jenkins and Scallion. On February 26, the district court ordered the cases of all defendants to be transferred from the Monroe Division to the Shreveport Division. No objection was interposed by Drane, whose motion was granted to adopt all motions filed by the other defendants

insofar as the relief requested applied to him.

Drane moved, on September 23, 1974, that the trial judge recuse himself, which motion was denied.[5]

Trial began on September 24, 1974, the cases of Buckelew, Jenkins, and Scallion, and the case of Drane having been consolidated. On October 4, 1974, the jury returned a verdict against the defendants on all counts, and the trial judge directed that judgment be entered accordingly.

## THE SCHEME AND CONSPIRACY

When viewed in the light most favorable to the government,[6] the evidence shows the following:

The purpose of the scheme and conspiracy was to fraudulently obtain money or property (chips readily convertible to money) from the casinos in the International Hotel (subsequently renamed Las Vegas Hilton), the Sands Hotel, the Landmark Hotel, and the Frontier Hotel. The scheme involved (1) checks written by appellants and Ray on the Delta Security Bank and Trust Company ("Delta Security") of Ferriday, Louisiana, without sufficient funds, (2) stop payment orders executed by them, and (3) misrepresentations to the casinos regarding their credit by Graves in his capacity as executive vice president of Delta Security. An essential element of the scheme was the causing (by appellants and Ray) of telephone calls to be made by the casinos to

---

**3.** This indictment also included Steven A. Welch, who was charged with violating 18 U.S.C. § 1343, but it was dismissed in respect to Welch on February 15, 1974, because of his death.

**4.** In their appeal briefs, Buckelew, Jenkins, and Drane have not argued error on this ruling, but have adopted the part of Scallion's brief covering this issue. Scallion argues error, but has abandoned his original reason (before the district court) and adopted one of the reasons cited by Buckelew and Jenkins below, namely: the adverse pretrial publicity of Graves. Scallion cites some 72 articles from central and northeastern Louisiana and Natchez, Mississippi, newspapers between January 24, 1973, and February 21, 1974, which appear as exhibits (Alexandria Daily Town Talk (11 articles);

Natchez Democrat (15 articles); Monroe Morning World (22 articles); The Concordia Sentinel (23 articles); and the Catahouls News Booster (1 article)).

**5.** Issues in this appeal arising from the denial of other motions of defendants-appellants are discussed *infra*.

**6.** *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942); *United States v. Middlebrooks,* 431 F.2d 299, 301 (5th Cir. 1970), *cert. denied,* 400 U.S. 1009, 91 S.Ct. 569, 27 L.Ed.2d 622 (1971). It should be noted that most of what follows was stipulated or unrebutted by other evidence, Scallion having been the only one of the appellants to testify.

Delta Security to obtain credit information on the basis of which the checks would be honored. Drane was to receive one third of the money obtained from the scheme.

On April 3, 1970, checking accounts at Delta Security were opened in the names of Buckelew and Scallion; similar accounts were opened in Ray's name on May 15, 1970, and in Jenkins' name on May 29, 1970, Jenkins' signature card with a $100 deposit having been mailed to the bank. Except for Ray's account, the initial deposit was $100; and in each case, contrary to usual practice, Graves was the bank officer who opened the account. In each case, the initial deposit slip bore the notation, "Hold Statement," and was initialed "J.G." (Graves), which meant that no statement of the account was to be mailed out.[7]

On April 3, 1970, Buckelew and Scallion, and on May 15, 1970, Jenkins, applied for and received a Bank Americard through Delta Security under the "executive sponsorship" program, which meant that Delta Security assumed liability for payment of charges on the card and that the issuing bank, Louisiana National Bank, was not required to investigate the applicant's credit. Each of the cards was issued and signed by Graves.

On January 29, 1970, and again on May 15, 1970, Jenkins rented a post office box in Ferriday; so did Buckelew on March 31, 1970, when he registered at a motel in Ferriday. Scallion rented a post office box in nearby Vidalia on April 2, 1970. Ray also had a post office box in Ferriday. Their personalized checks from Delta Security and Bank Americards were sent to them at their respective post office boxes. On April 1 and 2, Buckelew and Scallion, respectively, applied for Louisiana driver's licenses; on May 15, 1970, Jenkins obtained a renewal of his Louisiana driver's license.

On April 21, 1970, Buckelew registered at the International Hotel, where he made application for credit of $25,000 at the casino, giving Delta Security as his bank reference and his Bank Americard number. His Ferriday post office box was shown for his address. In checking his credit, a clerk telephoned Delta Security and was told that his account ran from $70,000 to approximately $500,000. (In the spring of 1970, Graves told a bookkeeper at Delta Security that "[t]here may be some calls coming in from Las Vegas on these accounts. If there are, take no information and refer them directly to me." She received a call the same day from Las Vegas which she referred to Graves.) Between April 22 and 26, 1970, Buckelew cashed five checks at the casino totaling $25,000.

On May 1, 1970, Scallion registered at the Landmark Hotel, where he made application for credit of $25,000 at the casino, giving Delta Security as his bank reference and his Bank Americard number. His Vidalia post office box was shown for his address. On the same date, information was received from Delta Security that his average balance was from $70,000 to approximately $400,000; and the record of telephone calls from the casino for that date showed that a call had been placed by the casino credit manager to Delta Security. Between May 1 and May 3, 1970, Scallion cashed six checks at the casino totaling $25,000.

On May 28, 1970, Ray registered at the Frontier Hotel and applied for $25,000 credit. The credit manager telephoned Delta Security and was transferred to Graves, who advised that Ray's account showed a demand balance of from $60,000 to $400,000. On May 29 and 30, 1970, Ray cashed five checks at the casino totaling $13,500.

On May 29, 1970, Jenkins registered at the Sands Hotel, giving his Ferriday post office box as his address, his Bank Americard number, and Delta Security as his bank reference. On the same date, he

7. The Louisiana phase of the investigation by the Federal Bureau of Investigation began in the summer of 1970. Special Agent John Pfeiffer of the Alexandria, Louisiana, area office, assisted by Special Agent Wooten, interviewed the employees at Delta Security and obtained from Graves (voluntarily) various records of the bank pertaining to appellants and Ray which were exhibits at the trial.

made application for $30,000 credit at the casino. In checking his credit, a casino credit investigator telephoned Delta Security and talked to Graves, who advised that Jenkins maintained a demand balance in his personal checking account of from $70,000 to approximately $400,000. On May 29 and 30, 1970, Jenkins cashed six checks at the casino totaling $20,000.

In all cases, the checks cashed by appellants were returned from Delta Security to the hotel casinos unpaid and marked "Payment Stopped."

During the first half of 1970, Ray met with Jenkins and Rhoads in Tulsa, Oklahoma. He was told by Jenkins that "they had a scheme which involved a Las Vegas hotel where they had a banker in a small town in Louisiana who would approve credit." Jenkins told him the details of the scheme and telephoned someone in Louisiana who Ray subsequently learned (from Jenkins) was Drane. In mid-May, Ray and Jenkins drove to Little Rock, Arkansas, where they met Scallion. Jenkins stated that Scallion would be assisting Ray in Las Vegas. Jenkins and Ray then drove to Ferriday, where they met with Drane, who operated "Lee's Seafood" restaurant, located between Ferriday and Vidalia. At this meeting, Ray was told that he was to take part in the scheme and that he and Jenkins were in Ferriday to get their identification; that those going to Las Vegas would keep a third of the money they got there, a third would go to the banker, and a third would go to Drane. At the end of the conversation, Drane made a telephone call and "arranged a meeting." Ray and Jenkins then drove to a small bar where they met Graves and discussed details of the scheme. Two days later (May 15, 1970), Jenkins and Ray again met with Graves. They agreed that Ray, who had not been able to obtain a Louisiana driver's license to use for identification, would tell the hotel casino credit people that he had lost his license for a driving violation and that Graves would confirm it. They also agreed on a time when Jenkins and Ray would apply for credit and Graves would be in his office to receive telephone calls. At the same time, Ray opened his checking account and signed several stop payment orders, leaving the amounts to be filled in later when he would telephone to advise the amounts of the checks he had cashed.

In Las Vegas, Ray and Scallion worked together. Ray would cash a check for, say $5,000, and would receive chips in $100 denominations. He would gamble away some of these before moving away from the table. Meanwhile, he would have passed some of the chips to Scallion. Later, they would cash in the remaining chips. During this time, they kept in touch with Jenkins who was operating at the Sands Hotel. Ray received his share of the receipts, and Jenkins was to deliver the remainder to Graves and Drane. Shortly afterwards (June 4, 1970), Jenkins registered under the name of "James Miller" at a motel in Ferriday.

## OPINION

Appellants have raised numerous issues which are set forth below, along with our analysis and disposition thereof.

*Whether the district court erred in refusing to dismiss the indictments for failing to state an offense against the United States.*[8]

■ Appellants present four arguments on this issue. First, it is claimed that the offenses charged were "inextricably tied to . . . dealings with the Nevada gambling casinos, and under the law of the State of Nevada, no action can be brought on a check given in payment of a gambling debt." The cited Nevada law is irrelevant to the federal offense of using interstate wire facilities in carrying out a scheme to defraud the casinos (and conspiring to do so). *Cf. United States v. Edwards,* 458 F.2d 875, 880 (5th Cir.), *cert. denied,* 409 U.S. 891, 93 S.Ct. 118, 34 L.Ed.2d 148 (1972).

Second, it is pointed out that stopping payment on checks is "a legal act under the

---

8. Our disposition of this argument disposes of the issue of whether the trial judge erred in denying motions for arrest of judgment, since that issue is premised on the same contention.

law of Louisiana." This also is irrelevant. Appellants' citation to *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), is misplaced, since that case, which involved the mail fraud statute (18 U.S.C. § 1341), was concerned with certain interstate mailings that were not made for the purpose of executing the alleged scheme; whereas, here the telephone calls which appellants caused the casinos to make to Delta Security in Louisiana were an essential element of the scheme.

■ Third, it is argued that the indictments (for conspiracy) did not contain a "plain, concise and definite written statement of the essential facts constituting the offense charged," as required by Fed.R.Crim.P. 7(c). The indictment of Buckelew, Jenkins, and Scallion specifies the essential elements of the alleged conspiracy and contains a list of twenty-five overt acts alleged to have been committed in furtherance thereof. The indictment of Drane also specifies the essential elements of the alleged conspiracy and contains a list of twenty-six overt acts—the same twenty-five as in the indictment of Buckelew, Jenkins, and Scallion plus the following:

> 26. During the period from about March, 1970, through about June, 1970, JUDSON LEE DRANE acted as an intermediary between GRAVES, on one hand, and SCALLION, JENKINS, RAY, and CLYDE ROBERT RHODES, on the other hand.

We are satisfied that the indictments were sufficiently plain, concise, and definite to inform appellants of the nature of the conspiracy and of their participation in it.

■ Fourth, it is contended that the indictment (for conspiracy) did not state sufficient facts to constitute a conspiracy to perpetrate an offense under 18 U.S.C. § 1343. This is without merit. Although each of the alleged acts (opening of checking accounts at Delta Security; traveling to Las Vegas; applying for credit at different

hotel casinos and giving Delta Security as a reference; receipt by Graves of calls from the casinos caused to be made by Buckelew, Jenkins, Scallion, and Ray; his giving favorable financial reports; cashing of checks (drawn on Delta Security) in large amounts at the casinos; nonpayment of the checks and their return stamped "Payment Stopped"), standing alone, may not have been unlawful, it is impressed with criminality as an element of the charged "scheme and artifice to defraud" involving transmission "in interstate commerce by means of wire communications" of "signs, signals and sounds" in violation of "Section 1343, Title 18."

### *Whether appellants were deprived of their Fifth Amendment rights because of the "delay" in their indictments.*

Appellants contend that the "delay" in their indictments until October 12, 1973, in the case of Buckelew, Jenkins, and Scallion, and until January 25, 1974, in the case of Drane, deprived them of their rights to due process. The criminal acts with which they were charged took place during the period April-May of 1970. The unrebutted testimony shows that the government began its investigation in the summer of 1970; that sometime early in 1971 or the middle of 1971 the investigation became "inactive" as a result of an opinion of the United States Attorney's Office in Las Vegas that, on the information developed, the case was not prosecutable at that time; and that the investigation was reopened in the spring of 1973 at the instigation of Special Agent Pfeiffer. A colloquy between the trial court and counsel during the trial indicates that a reason for reopening the investigation was the failure of Delta Security (in January of 1973) and Pfeiffer's view that, with their jobs no longer at stake, two of the bank's employees would speak more freely to him.[9]

■ Appellants' citation of *Dickey v. Florida*, 398 U.S. 30, 90 S.Ct. 1564, 26

---

9. The transcript shows the following colloquy when one of those employees was testifying:

THE COURT: She [the witness] said before there were two things: First of all, she

L.Ed.2d 26 (1970), is inapposite, since that case related to the Sixth Amendment right to a speedy trial—not to Fifth Amendment rights involved in preaccusation "delay." *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *United States v. Pereira,* 524 F.2d 969 (5th Cir. 1975). This court has interpreted *Marion* to require a showing by a defendant that such "delay" caused him substantial actual prejudice *and* that the prosecution intended to gain a tactical advantage from the "delay." *United States v. Duke,* 527 F.2d 386 (5th Cir. 1976); *United States v. Beckham,* 505 F.2d 1316, 1319 (5th Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1683, 44 L.Ed.2d 104 (1975). Absent such a showing, the statute of limitations will be presumed to protect a defendant from overly stale criminal charges. *See United States v. Ewell,* 383 U.S. 116, 122, 86 S.Ct. 773, 777, 15 L.Ed.2d 627, 631 (1966); *United States v. Butts,* 524 F.2d 975 (5th Cir. 1975). Appellants have made no such showing.

### *Whether appellants were deprived of their Sixth Amendment right to a speedy trial.*[10]

Scallion argues that the "delay" in his trial from November 16, 1973 (the date of his first appearance before a U.S. Magistrate, at which time he demanded a speedy trial) until September 24, 1974, when trial began, violated his Sixth Amendment right to a speedy trial. He claims that the testimony of Rhoads, who died in September of 1970 (while the initial investigation was still proceeding), was lost by the undue delay and that such testimony was "material and critical to the defense." However, as the government points out, loss of Rhoads' testimony was attributable to his death, only a few months after the events charged in the

indictment, and not to delay in the trial. Scallion also claims that Welch, one of the persons indicted, was deceased, but does not argue, much less show, that Welch's testimony would have been material and critical to his defense; nor is there any basis for inferring that such testimony would have been exculpatory of him or the other appellants, the "delay" in whose trials ranged from some seven and a half months (from date of arrest) in the case of Drane to some eleven months in the case of Buckelew and Jenkins. *See United States v. Merrick,* 464 F.2d 1087, 1091 (10th Cir.), *cert. denied,* 409 U.S. 1023, 93 S.Ct. 462, 34 L.Ed.2d 314 (1972).

Appellants cite *Dickey v. Florida, supra,* for the statement that "the duty of the charging authority is to provide a prompt trial." However, that duty is to be considered on an *ad hoc* basis, taking into account such factors as length of delay, reason for the delay, the defendant's assertion of his right to a speedy trial, and prejudice to the defendant. *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 116 (1972). We do not regard the lapse of time here involved as "delay," much less "inordinate delay." *Cf. Moore v. Arizona,* 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973). The record is replete with pretrial motions by the defendants generating responses by the prosecution, briefs, and hearings. *Cf. United States v. Clendening,* 526 F.2d 842 (5th Cir. 1976). Meanwhile, all of the defendants were free on bond, except Scallion, who, at the time of his magistrate's appearance, was on trial in California on other charges and was also under a prison sentence in New York, to which he was required to be returned following the California trial. Moreover, it is evident that the prosecution had to arrange

---

was never interviewed by an FBI Agent before and, second, she was afraid of losing her job and for both of those reasons she withheld information from the FBI. Is that what you said?

THE WITNESS: Exactly.

**10.** The Sixth Amendment provides:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public

trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and case of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

the appearance of numerous out-of-state witnesses. There has been no showing that the lapse of time impaired appellants' ability to defend themselves or jeopardized their other interests. *United States v. Rosson,* 441 F.2d 242 (5th Cir.), *cert. denied,* 404 U.S. 843, 92 S.Ct. 140, 30 L.Ed.2d 78 (1971).

## *Whether the district court erred in denying motions for severance and separate trials.*

■ Appellants' argument is premised on the adverse pretrial publicity of Graves. They state that the transfer of the trial from the Monroe Division to the Shreveport Division "may have been adequate prior to the conviction of Mr. Graves on a related indictment [associated with the failure of the Delta Security Bank and Trust Company], but subsequent to that conviction the transfer . . . was inadequate to avoid the prejudice, through association, that over-shadowed the trial of this matter." However, they have called our attention to no evidence of inherent prejudice in the trial setting or actual prejudice from the jury selection process. *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). There is no evidence that the newspapers containing the articles on Graves were circulated in the Shreveport area, much less the degree of circulation, from which might be drawn an inference of sufficient prejudice to support a holding of abuse of discretion by the district court's refusal to grant severance and separate trials. *See Peterson v. United States,* 344 F.2d 419 (5th Cir. 1965). Furthermore, both before and during the trial, the trial judge instructed the jury to "totally disregard" and "pay no attention to" anything the members might read or hear in the news media. The following statement from *United States v. Edwards,* 488 F.2d 1154, 1160 (5th Cir. 1974), is particularly supportive of our holding against appellants on this issue:

> The general rule is that persons jointly indicted should be tried together, especially in conspiracy cases. "A mere showing of some prejudice has usually been insufficient, for qualitatively it must be

the most *compelling* prejudice against which the trial court will be unable to afford protection." [*United States v. Perez,* 489 F.2d 51, 65 (5th Cir. 1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974).]

## *Whether the trial judge erred in denying the motion to recuse.*

■ Appellants argue that the affidavit attached to Drane's motion was sufficient to require the trial judge to recuse himself. The ground set forth in the affidavit is that during a previous trial the judge had

> exhibited a prejudice against the defendant JUDSON LEE DRANE, by reason of DRANE'S alleged association with Noah V. Cross which prejudice JUDSON LEE DRANE believes still exists.

During consideration of the motion, Drane's counsel merely restated the above ground, which obviously is totally lacking in specifics, such as how the alleged prejudice had been exhibited and what was the basis for the affiant's belief. We note that the trial judge commented that he had forgotten about the case and that, before denying the motion, he stated:

> In this case, as far as Mr. Drane and all the other defendants, they are presumed to be innocent until and unless proved guilty to the satisfaction of the jury beyond a reasonable doubt and I will so conduct this trial.

We are satisfied that this issue is without merit.

## *Whether the trial judge erred in denying appellants the list of prospective jurors until the day of trial.*

■ Appellants argue that the adverse pretrial publicity was so prejudicial that the list from which the jurors were drawn should have been thoroughly investigated so that the prospective jurors could have been questioned on *voir dire* sufficiently to insure a fair trial. We have already held against appellants on the issue relating to severance and separate trials which was based on the allegation of adverse pretrial publicity. Moreover, it is

within the discretion of the trial judge to withhold the list of prospective jurors until the day of the trial. *United States v. Clarke*, 468 F.2d 890, 891 (5th Cir. 1972); *Stone v. United States*, 324 F.2d 804, 807 (5th Cir. 1963), *cert. denied*, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964). Appellants filed with the court a request for questions to be propounded during *voir dire* and do not allege any omissions from *voir dire* questioning; nor have they made any showing of how an earlier examination of the list would have changed the questions during *voir dire*.

*Whether the trial judge abused his discretion in admitting Las Vegas hotel casino records into evidence under the Business Records Act, 28 U.S.C. § 1732(a).*[11]

 Appellants argue that credit applications, registration cards, and telephone records of the International Hotel, Sands Hotel, and Landmark Hotel pertaining to Buckelew, Jenkins, and Scallion, respectively, were improperly authenticated and erroneously admitted into evidence as an essential element of proving that they caused an interstate wire communication to be transmitted. They cite such cases as *United States v. Wyatt*, 437 F.2d 1168 (7th Cir. 1971); *United States v. Burruss*, 418 F.2d 677 (4th Cir. 1969), and *United States v. Shiver*, 414 F.2d 461 (5th Cir. 1969), for holdings that the hearsay contained in police records (that an automobile theft actually occurred) was inadmissible. However, the court well said in *Burruss*:

Thus a police record would be admissible to show that a *report* [of a theft] was made to an officer, even though the recorder was not the officer to whom the report was made. [Emphasis supplied.]

So, too, the records of the hotels were admissible to show (1) that Buckelew, Jenkins, and Scallion made credit applications, and the information recorded thereon; (2) that these applications caused interstate phone calls to be made; and (3) that credit information was received from the calls, and the information that was received and recorded. Just as the police record was not admissible to prove that the theft itself had, in fact, occurred, so the hotel records would not have been admissible to prove the truth of the information recorded. Indeed, it is obvious that the credit information recorded on appellants' credit applications was not truthful.

Appellants cite a dictum in *Seeber v. United States*, 329 F.2d 572 (9th Cir. 1964), in which the issue concerned the trial court's admission of three telephone company toll slips to prove the phone calls by which an alleged act of extortion had been attempted. There were written notations on the slips indicating that calls had been made from the defendant's home telephone number to the number of the victim. However, the operators could not identify the persons who had made the calls. The court found independent evidence sufficient to allow admission of the slips, but said:

If there had been no other proof on the subject, save the testimony of the operators, then the slips, without any collateral proof tending to link defendant with the calls, lacked authenticity and should not have been admitted.

---

11. Prior to its replacement on July 1, 1975, by Rule 803(6) of the Federal Rules of Evidence, this section provided:

(a) In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

The term "business," as used in this section, includes business, profession, occupation, and calling of every kind.

We have no quarrel with that statement, but it has no applicability to this case, where Buckelew's, Jenkins', and Scallion's "link" to the hotel records was established by independent evidence.[12]

It is argued that some of the witnesses from the hotels who testified concerning the casino records were not employed there at the time the records were made. However, in the case of each record introduced, the present custodian testified that the record was kept in the regular course of the hotel's business. There has been no suggestion that such records were established and maintained for any purpose other than business, and their nature indicates that they are not mere cumulations of hearsay or uninformed opinion. *See Sabatino v. Curtiss National Bank*, 415 F.2d 632, 637 (5th Cir. 1969), *cert. denied*, 396 U.S. 1057, 90 S.Ct. 750, 24 L.Ed.2d 752 (1970).

■ Scallion contends that he was denied his Sixth Amendment right of confrontation with the person who made a telephone call from the Landmark Hotel to Delta Security, referring to the person as "his accuser." However, as Scallion himself points out, that person did not testify and made no deposition that was exhibited to the jury. The contention apparently amounts to saying that the Business Records Act cannot apply to a record where the person who made the record is not called to testify at a hearing or by deposition. However, the Congress has the power to prescribe what evidence is to be received in the federal courts, as long as it does not, at the same time, prescribe that such evidence shall conclusively prove "the existence of the ultimate fact on which guilt is predicated." *Tot v. United States*, 319 U.S. 463, 467, 63 S.Ct. 1241, 1245, 87 L.Ed. 1519,

1524 (1943); *Luria v. United States*, 231 U.S. 9, 25, 34 S.Ct. 10, 14, 58 L.Ed. 101, 106 (1913); *Bailey v. Alabama*, 219 U.S. 219, 238, 31 S.Ct. 145, 150, 55 L.Ed. 191, 200 (1911); *see McDaniel v. United States*, 343 F.2d 785 (5th Cir.), *cert. denied*, 382 U.S. 826, 86 S.Ct. 59, 15 L.Ed.2d 71 (1965).

Accordingly, we conclude that there was no abuse of discretion by the trial judge in admitting such records into evidence. *See United States v. Middlebrooks*, 431 F.2d 299, 302 (5th Cir. 1970), *cert. denied*, 400 U.S. 1009, 91 S.Ct. 569, 27 L.Ed.2d 622 (1971).[13]

*Whether the trial judge erred in refusing to suppress evidence which the government allegedly failed to furnish in compliance with pretrial discovery order.*

■ The pretrial discovery order of February 19, 1974, directed the government to give the defendants any handwriting exemplars or any document containing their signatures "within a period of three weeks." During the trial, government counsel offered a driver's license application allegedly signed by Scallion. A copy of this had not been furnished Scallion, and objection was raised to its admissibility. Government counsel stated that he had "just received it recently," and added:

> In the event we have not complied, it was not deliberate. We have given the defense stacks of documents we may introduce or not introduce. There is always a possibility of an oversight.

The trial judge noted that three weeks from February 19 would extend into early March, whereas the Certificate of Administration Of Drivers License Division (which transmitted Scallion's application) was dated in July, so that there had been literal

---

12. For example, the stipulation of Buckelew's and Scallion's signatures on the credit applications, and the in-court identification of Jenkins by a witness who had taken his credit application and cashed one of his checks for $6,000.

13. Buckelew and Jenkins cite *United States v. Feinberg*, 140 F.2d 592 (2d Cir.), *cert. denied*, 322 U.S. 726, 64 S.Ct. 943, 88 L.Ed. 1562 (1944), *overruled on other grounds, United States v. Taylor*, 464 F.2d 240 (2d Cir. 1972), for the statement that corporate books of account are not competent against a stranger merely because they are the books of the company whose dealings they purport to record. However, they overlook that the court had determined that there had been no testimony showing that the books had been kept in the regular course of business. *See Jolley v. United States*, 232 F.2d 83 (5th Cir. 1956).

compliance with the discovery order. The trial judge directed a two-day delay in offering the application in evidence, observed that the only purpose of the discovery order was to prevent surprise, and said that "forty-eight hours is ample time to overcome any surprise." Appellant has not argued that the forty-eight hour period was inadequate to its identification of the application and preparation for defense. We conclude that there was no abuse of discretion by the trial judge. *See Pierce v. United States*, 414 F.2d 163 (5th Cir.), *cert. denied*, 396 U.S. 960, 90 S.Ct. 435, 24 L.Ed.2d 425 (1969).

*Whether the trial judge erred in refusing to suppress evidence obtained from Graves.*

■ Appellants Buckelew, Jenkins, and Scallion have adopted the portion of Graves' brief on this issue. Although Graves' appeal has been dismissed, we will consider the issue.

It is contended, in effect, that Graves' Fifth Amendment rights, as interpreted by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were violated, so that Delta Security's records pertaining to their accounts were not admissible. The government argues that appellants have no standing to challenge the admissibility of such evidence and, citing *Byrd v. Comstock*, 430 F.2d 937 (9th Cir. 1970), *cert. denied*, 401 U.S. 945, 91 S.Ct. 960, 28 L.Ed.2d 228 (1971), states that the privilege against self-incrimination is a personal right that cannot be claimed by third parties. We agree with the Ninth Circuit's position. It is well-settled that Fourth Amendment rights cannot be claimed by third parties, and we see no

reason why the principle should not apply here to appellants' Fifth Amendment rights. *Alderman v. United States*, 394 U.S. 165, 171–76, 89 S.Ct. 961, 965–968, 22 L.Ed.2d 176, 185–188 (1969); *United States v. Holmes*, 521 F.2d 859, 867 (5th Cir. 1975); *United States v. Scasino*, 513 F.2d 47, 50 (5th Cir. 1975).[14]

*Whether the trial judge erred in refusing to suppress the testimony of Ray.*

■ Appellants argue that Ray's guilty plea was knowingly withheld by the prosecution at arraignment and during the pretrial motion period in violation of the standards set forth in *Bryan v. United States*, 492 F.2d 775 (5th Cir.), *cert. denied*, 419 U.S. 1079, 95 S.Ct. 668, 42 L.Ed.2d 674 (1974); further, that the prosecution failed to provide a full and timely disclosure (delaying until cross-examination) of Ray's prior criminal activities and his involvement with law enforcement agencies,[15] in disregard of the court's discovery order and in violation of the "Brady Rule" (*Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

First, the record of the proceedings on August 12, 1974, involving Ray's change of plea to guilty on one of two counts shows substantial compliance with the standards prescribed in Bryan, which are designed to reveal to the court the existence and details of any plea bargaining. The record shows that the court was fully informed on the matter. There is no evidence of withholding of Ray's change of plea and plea bargain by the prosecution; rather, these were set forth in the DISCLOSURE OF INFOR-

---

14. The government vigorously disputes the contention that Graves' Fifth Amendment rights were violated, arguing that he was not in custody, that he voluntarily turned over the records pertaining to appellants' accounts, and that he, as an officer of the bank corporation, was merely the custodian of corporate records, which he could not refuse to produce on Fifth Amendment grounds.

15. Ray testified that he began working for the Drug Enforcement Administration in an undercover capacity in 1972; that he was convicted of a burglary, which occurred before that time,

in Tulsa, Oklahoma; that his conviction was reversed on appeal and his sentence was suspended on January 28, 1974; that subsequently he received a suspended sentence on conviction of conspiracy to commit arson in Wichita, Kansas, prior to the Tulsa burglary; and that the Drug Enforcement Administration had intervened in his behalf. Special Agent Pfeiffer testified that the intervention was "to keep this man from going to prison where he would be subject to death by the various persons he made cases on."

MATION FAVORABLE TO DEFENSE, filed with the court on August 14, 1974.

Second, rather than suppressing information, it appears that the prosecution itself had difficulty in obtaining the facts about Ray's criminal record and his connection with the Drug Enforcement Administration.[16]

Finally, the record shows that appellants were permitted by the court to make a full record on their assertion that the prosecution had intentionally withheld information about Ray and to cross-examine him at length.

Appellants further argue that the "failure to provide full and timely disclosure" deprived them of "material which could have been exculpatory," but they do not explain how its earlier disclosure would have made it any more "exculpatory" than it was when disclosed during the trial before their cross-examination of Ray. This is a far cry from *Brady,* where the prosecution suppressed a codefendant's confession and the jury never had an opportunity to consider it.

Appellants further argue that Ray was an informer in this case, but there is no evidence to support the argument. They also intimate that he gave false testimony, but that was a matter for the jury to decide.

Jenkins argues that Ray's testimony concerning what Jenkins said, in connection with the planning and execution of the alleged conspiracy, should have been excluded as hearsay. However, as with the argument of Drane on this point (discussed under the next issue), Ray was testifying to facts of his own knowledge.[17] Accordingly, the citation to *United States v. Oliva,* 497 F.2d 130 (5th Cir. 1974) is inapposite.

We are not persuaded that there was error in refusing to suppress Ray's testimony.

*Whether the trial judge erred in denying motions for judgment of acquittal.*

Buckelew bases his argument on insufficiency of the evidence.[18] He states that the government's evidence merely established that he "opened a bank account, went to Las Vegas, succumbed to the temptation to gamble on credit, became disgruntled and stopped payment on his checks to the casinos, as he had a perfect legal right to do." He points to Ray's testimony that he (Ray) was not acquainted with him and that, as far as Ray knew, he was not in-

---

16. Special Agent Pfeiffer testified as follows: The biggest difficulty on unraveling both charges in Wichita and Tulsa was that this was an area that was being worked out between the drug enforcement administration and local authorities in those two jurisdictions to protect Mr. Ray, and at the same time clear up those hanging charges. A lot of the information we got had to come second-hand through drug administration and other agencies.

17. Appellants' argument that the trial judge erred in failing to instruct the jury to disregard Ray's testimony as hearsay is, therefore, not well taken. Furthermore, the court properly instructed the jury as follows:

Whenever it appears beyond a reasonable doubt from all the evidence in the case that a conspiracy existed, and that a defendant was one of its members, then the statements thereafter knowingly made and the acts thereafter knowingly done, by any person likewise found to be a member, may be considered by the jury as evidence in the case as to the defendant found to be a member, even though the statements and acts may have

occurred in the absence and without the knowledge of the defendant . . . .

18. We note that in the original brief filed jointly by Buckelew and Jenkins, Jenkins does not contest sufficiency of the evidence, although he moved for a directed verdict below. Part V of that brief states: "THE EVIDENCE AGAINST DEFENDANT BUCKELEW IS CLEARLY INSUFFICIENT TO SUPPORT A CONVICTION ON EITHER COUNT OF THE INDICTMENT, AND THE DISTRICT COURT ERRED IN DENYING THAT DEFENDANT'S MOTION FOR ACQUITTAL." The government's brief states: "Appellant Jenkins does not claim that the evidence was insufficient." The reply brief of Buckelew and Jenkins, saying that such a statement was incorrect, points to Buckelew's and Jenkins' adoption of all motions before the district court. The fact remains that Jenkins has presented no argument on this issue. To the extent that the arguments in the briefs of the other appellants might be considered applicable to him, our disposition of such arguments extends to him.

volved in the scheme; also to Scallion's testimony that he (Scallion) was not aware that he went to Las Vegas in 1970 and that he (Scallion) did not discuss his own admitted trip to Las Vegas with him. However, the evidence is clearly sufficient to have enabled the jury to find, beyond a reasonable doubt, that Buckelew, along with Jenkins, Scallion, and Ray had caused the placing of telephone calls in carrying out a scheme to defraud the casinos; further, that he was involved in a conspiracy to so carry out that scheme. *See United States v. Jackson,* 451 F.2d 281 (5th Cir. 1971), *cert. denied,* 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972); *Huff v. United States,* 301 F.2d 760 (5th Cir.), *cert. denied,* 371 U.S. 922, 83 S.Ct. 289, 9 L.Ed.2d 230 (1962). It was not necessary for Ray to know Buckelew or that he was involved in the scheme; nor was it necessary for Scallion to be aware of Buckelew's trip to Las Vegas in 1970 or for Scallion to have discussed his own trip with Buckelew. *Sears v. United States,* 343 F.2d 139 (5th Cir. 1965). Buckelew cites this court's opinion in *Roberts v. United States,* 416 F.2d 1216 (5th Cir. 1969), for its comments about guilt by association, but the evidence of overt acts goes far beyond mere "association." He argues that Delta Security lost nothing from its dealing with him. That, of course, was not the purpose of the scheme.

Scallion argues that business records of the Landmark Hotel could not be used to establish an essential element of the crime. However, we have already decided this issue against appellants.

Drane bases his argument on the assertion that Ray's testimony was hearsay and inadmissible against him, since the government failed to establish Drane's membership in the conspiracy by independent evidence. However, the following portions of Ray's testimony pertaining to Drane clearly are not hearsay:

Q. What was said between you and Blackie Drane?

A. Jenkins introduced me to him and I was to participate in the scheme and we were there to get our identification.

. . . . .

Q. What was done, as best you can recall, among you, Jenkins and Drane?

A. There was a discussion about the Las Vegas trip and reference made to the banker and there was some discussion about the money on previous schemes.

. . . . .

Q. Was there any discussion about any money to be brought back in the future?

. . . . .

A. We were to receive one-third for our end, one-third for the gentleman at the bank and one-third for Mr. Drane.

. . . . .

Q. Was that agreed upon among you?

A. Yes, sir.

. . . . .

Q. You recall anything else that was said during that conversation?

A. No, sir.

Q. Where did you go from there?

A. Mr. Drane made a phone call and arranged a meeting and Mr. Jenkins and I traveled to near Ferriday to a small bar situated in an old house of some type and there we met Mr. Graves from the bank.

Ray was testifying concerning a meeting involving himself, Jenkins, and Drane, their conversation at that meeting, and Drane's telephone call arranging a meeting which the jury could reasonably infer was the meeting with Graves. He was not testifying concerning what he "heard" about a conversation at a meeting involving Drane. *United States v. Perez,* 489 F.2d 51 (5th Cir. 1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). There was ample evidence establishing a conspiracy involving Buckelew, Jenkins, Scallion, and Ray, and Ray's testimony concerning facts within his knowledge, if believed by the jury, was sufficient to show Drane's know-

ing participation in that conspiracy. *United States v. Warner,* 441 F.2d 821 (5th Cir.), *cert. denied,* 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971).

*Whether the trial judge erred in denying motions for a new trial.*[19]

Aside from arguing that the trial judge erred with respect to issues previously considered, appellants argue that various procedural errors were committed which denied them their rights to due process.

■ (1) It is said that, at commencement of the trial, after the jury had been impaneled and while all of the witnesses were in the courtroom, the trial judge identified each defendant and his attorney; that one of the witnesses later made an in court identification of Jenkins concerning a single confrontation that had taken place more than four and a half years prior to trial; and that, accordingly, the identification was "tainted," with resulting prejudice to appellants. However, the record shows that the trial judge identified only *counsel* for the government and for each defendant prior to sequestration of the witnesses. Moreover, Jenkins could not have been prejudiced since he admitted that he wrote the check about which the witness testified.

■ (2) It is argued that the trial judge erred in giving certain specified instructions to the jury over objection, but what therein was error is neither specified nor apparent. The government pointed this out in its brief and stated that the instructions "were standard." There was no response in appellants' reply brief. We note that objection was made below to the trial judge's quotation from the opinion of the Chief Justice in *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), concerning the legality of plea bargaining; but we see nothing contrary to law or prejudicial in the quotation, which appears in *Bryan v. United States, supra,* cited in appellants' reply brief.

■ (3) The trial judge stated to the jury that "Mr. Davenport was appointed by the Court to represent Mr. Scallion," and that the lawyers representing Scallion, Drane, and Graves "will be paid by the Federal Government for their services as attorneys in this case." Scallion contends that this charged him with being an "indigent" and was prejudicial and "suggestive of financial irresponsibility and criminal responsibility." The statement was made in leading up to the observation that all counsel, on both sides, were officers of the court. On its face, the contention is pure speculation. *See United States v. Newsom,* 493 F.2d 439, 440 (5th Cir. 1974).

■ (4) Appellants, citing nine portions of the transcript, assert that the participation by the trial judge in interrogating the witnesses was "excessive and biased in favor of the prosecution." The government replies that the court's questioning was to clarify the testimony or to avoid repetition, and appellants have not responded to this assertion in their reply brief. We note that on one occasion the trial judge instructed the jury to disregard his question and the answer thereto; on another occasion the trial judge withdrew the question; and on another occasion the jury was not even in the room. No objection by appellants' counsel was made on the remaining occasions, save one. We are satisfied that no prejudice to appellants could have occurred from the trial judge's questions. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Kelly,* 329 F.2d 314 (3d Cir. 1964); *Woodring v. United States,* 311 F.2d 417 (8th Cir.), *cert. denied,* 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963).

■ (5) It is pointed out that the jury was not sequestered and was permitted to return home each evening upon adjournment of court; that on October 4, 1974, the trial was concluded and the jury retired for deliberations; that at 9:30 P.M. the jury had not reached a verdict, and the members

---

**19.** Our disposition of this issue also disposes of the issue of whether the conduct of the trial and demeanor of the presiding judge violated appellants' rights to due process of law.

920

were instructed that at 10:00 P.M. they would be sequestered overnight in a local hotel to resume their deliberations the next morning; and that at 9:55 P.M. the jury returned its verdict. However, the record discloses that the jury retired to deliberate at 4:25 P.M., which shows that it was out for five and a half hours. To suggest that appellants were prejudiced appears to be pure speculation.

■ (6) Appellants Buckelew and Jenkins call attention to one occasion (apparently in chambers) when the trial judge was informed regarding their indigent condition and the trial judge responded that the matter would be taken up after trial. They argue that the reason for bringing this to the trial judge's attention was to make it possible to call witnesses, because their financial condition was such that they could not make the necessary deposit against the subpoena cost. At oral hearing on this appeal, government counsel stated that the reason given to the trial judge was not a witness problem, but to obtain money for hotel accommodations. In any event, there is nothing in the record which supports appellants' argument.

■ In view of the foregoing, we conclude that there was no error in the denial of motions for a new trial.[20]

The judgment is affirmed.

JOHN R. BROWN, Chief Judge (concurring):

I concur fully in the result and the opinion. I make these observations with respect to that part which deals with the issue of whether the trial judge should have admitted into evidence the hotel casino records and records of telephone calls under the Business Records Act.[1] These records were clearly not hearsay and are just as reliable as if a live witness at the casino or a bystander in the bank had testified that he overheard the bank officials give the critical credit information to the hotel casino employees.

As Judge Miller so well demonstrates, these records were not admitted to prove the truth of the representations made therein, but were properly admitted as verbal acts which were indicative that the representations—indeed the misrepresentations—were in fact made; and this is the issue of importance in this case.

The Court's opinion does not cite the Ninth Circuit's *Seeber* opinion for the proposition that the defendant must be "linked" to the particular business records sought to be admitted in order for the Business Records Act to apply. Of course the business records must relate to the defendant's conduct at issue in the prosecution, but this is a question of relevancy and not another element to be engrafted on the Business Records Act.

For example, the hotel records and telephone records concerning another person's account might satisfy all the requirements of the Business Records Act, but nevertheless would not be admissible at this trial because they are not "linked" to the defendant's conduct. Conversely, records which are directly related to the defendant's conduct are admissible if they satisfy the elements of the Business Records Act even though they lack corroboration from some live swearer. Thus, in this case the fact that some employee of the casino responsible for investigation and approval of credit did not testify in person is not determinative because the records qualifying un-

20. Jenkins argues that there was a clear violation of Fed.R.Crim.P. 32(a) in that before sentencing he was not afforded an opportunity to make a statement in his own behalf and to present any information in mitigation of punishment. We note that over four pages of the transcript are devoted to his counsel's moving statement in his behalf in mitigation of punishment, and that he gave no indication that Jenkins himself wished to make an additional statement. We conclude that Jenkins was accorded the benefit of the rule.

1. The topic head to which I refer is: *Whether the trial judge abused his discretion in admitting Las Vegas hotel casino records into evidence under the Business Records Act, 28 U.S.C.A. § 1732(a).*

der the Business Records Act would be quite sufficient to establish the fact that credit was established.[2]

Thus, both relevance or "linkage" and the Business Records Act requirements are prerequisites to the record's admission into evidence, but the concepts are logically and legally distinct considerations to be assayed by the trial court in determining admissibility. And concerning the records of telephone conversations, the trial court acted properly in admitting them since they satisfied the elements of the Business Records Act, see *United States v. Miranda*, 9 Cir., 1971, 443 F.2d 1351, 1357, *cert. denied*, 404 U.S. 966, 92 S.Ct. 343, 30 L.Ed.2d 286, once the Judge was satisfied that they were linked to the defendant's conduct so as to be relevant to the controversy.

---

2. In *United States v. Blake*, 5 Cir., 1973, 488 F.2d 101, 105 we discussed the elements which should be considered by the Court in determining admissibility under the Business Records Act:

█ Liberal as we are to the fullest use of 28 U.S.C.A. § 1732, there are two prerequisites both of which are to be demonstrated to permit admission of business records. First, the Federal Business Records Act states that the offeror must establish that the records were kept in the regular course of business. *Louisville & Nashville Railroad Co. v. Knox Homes Corp.*, 5 Cir., 1965, 343 F.2d 887; *United States v. Barson*, 5 Cir., 1970, 434 F.2d 127, 128. Secondly, testimony must be given by a custodian adequately authenticating the record's accuracy and explaining the efforts employed to ensure this accuracy. *United States v. Dawson*, 2 Cir., 1968, 400 F.2d 194, 198–199, cert. denied, 1969, 393 U.S. 1023, 89 S.Ct. 632, 21 L.Ed.2d 567; *Bridger v. Union Railway Co.*, 6 Cir., 1966, 355 F.2d 382, 391–392.

█ It is the circumstances under which the records are recorded, kept, maintained and used that gives the reliability essential to the law's conclusion that without any independent recollections by those who made the succession of entries they are reliable, precisely because the business relies on them for important business judgments. This principle of business acceptance was recognized by our Court in *Missouri Pacific Railroad Co. v. Austin*, 5 Cir., 1961, 292 F.2d 415, when we stated:

"In the approach of the Model Act trustworthiness comes from a record (1) regularly made in the course of a business, (2) if it is a part of the regular course of that business to record the event or transaction at or near the time of its occurrence. Most frequently the inquiry concerns the regularity of the making of that record in a particular business. 292 F.2d at 422. (Footnotes omitted).