**UNITED STATES of America, Appellee,**

v.

**Myron LIEBERMAN, Appellant.**

**No. 86, Docket 80–1179.**

United States Court of Appeals, Second Circuit.

Argued Sept. 24, 1980.

Decided Dec. 16, 1980.

---

**96**

Harvey M. Stone, Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., Eastern District of New York, Mark A. Summers, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Peter D. Aiken, Fort Lauderdale, Fla. (Aiken & Damore, Fort Lauderdale, Fla.), for appellant.

Before MOORE and KEARSE, Circuit Judges, and TENNEY,* District Judge.

KEARSE, Circuit Judge:

Myron Lieberman appeals from a judgment of conviction entered after a jury trial in the United States District Court for the Eastern District of New York before Mark A. Costantino, Judge, on one count of conspiracy to distribute and to possess with intent to distribute approximately 2,375 pounds of marijuana in violation of 21 U.S.C. § 846 (1976). Lieberman was sentenced, pursuant to 18 U.S.C. § 3651 (1976), to a term of five years' imprisonment, with four months to be served, three years' probation, and the remaining one year and eight months suspended. He was also fined $5,000 and sentenced to a special parole term of five years. We affirm the conviction, but vacate the sentence and remand for resentencing so that the special parole term may be deleted.

* The Honorable Charles H. Tenney, Senior Judge of the United States District Court for the Southern District of New York, sitting by designation.

## I

On Saturday, December 2, 1978, agents of the United States Drug Enforcement Agency ("DEA") in Brooklyn, New York, intercepted a shipment of more than one ton of marijuana as it was being unloaded from a van belonging to Lieberman Movers, a household moving company whose Fort Lauderdale office was run by the defendant Myron Lieberman. The agents arrested the driver of the van, John Briggs, and his helper, Calvin Mapp, along with the two men who were helping to unload the forty-six cartons containing the marijuana, Louis Caparella and Robert D'Ambra. This appeal arises out of the trial of Myron Lieberman and Willie Gaines, the warehouse foreman of Lieberman's Fort Lauderdale operations, on one count of conspiracy to distribute and to possess with intent to distribute the marijuana.[1] At trial, Lieberman stipulated that the marijuana had been shipped from his Florida offices to Brooklyn. He contends, however, that certain evidence offered at trial to link him with the shipment was improperly allowed, and that in any event there was not sufficient evidence to convict him.

The evidence against Lieberman came primarily from the testimony of William Flynn and Steven Hamilton, two former employees of Lieberman Movers in Fort Lauderdale, as to events at that operation from November 27 through December 4, 1978.

Flynn testified that on Monday, November 27, D'Ambra and Caparella visited the Fort Lauderdale warehouse of Lieberman Movers where they spoke with Joyce Lieberman, a secretary, and Alan Breslow, the dispatcher. Flynn overheard D'Ambra and Caparella say that Joe Lieberman, Myron's uncle who ran the Brooklyn office of Lieberman Movers, had "told them to see Myron about getting some dishpacks[2] for closing up a small business deal, moving some stuff back to New York." D'Ambra also spoke to Briggs who stated that he would see them in New York on Saturday morning. As D'Ambra and Briggs parted, Briggs put his hand in his pocket, and shortly thereafter told Gaines that the two men were good payers and wanted some "stuff" packed. Later that day, Flynn placed several bundles of flattened dishpacks on the loading dock, where they remained unopened through most of November 28.

When Flynn reported for work at 7:30 a. m. on Wednesday, November 29, approximately 40 dishpacks had been packed and sealed and were stacked along the warehouse wall. Flynn testified that the boxes had been taped in a way that, among Lieberman employees, was unique to Gaines. Later that morning, as Flynn and several other employees were standing nearby, Flynn overheard a conversation between Gaines and Briggs, which he described at trial, over Lieberman's objection, as follows:

Q Did you hear Mr. Gaines say anything?

＊ ＊ ＊ ＊ ＊ ＊

A Mr. Gaines told Mr. Briggs, I heard you come in last night with the truck. Approximately 9:00 o'clock at night.

Q At approximately 9:00 o'clock?

A Yes.

Q And did Mr. Briggs say anything?

A He says where were you. And Mr. Briggs—

＊ ＊ ＊ ＊ ＊ ＊

---

1. After their arrest, Briggs and Mapp were released and were never indicted. The original indictment (79 Cr. 2) was returned against only D'Ambra and Caparella and charged them with conspiracy and possession. They moved to suppress the evidence seized by the agents when the truck was being unloaded. Subsequently a superseding indictment was returned, (79 Cr. 2(S)) adding Gaines and Lieberman, who then joined in the previously filed motion to suppress. That motion was granted as to D'Ambra and Caparella in its entirety, and as

to Gaines and Lieberman with respect to the possession count. The case against D'Ambra and Caparella was severed and was eventually dismissed, as was the possession count against Gaines and Lieberman. None of these pretrial rulings is at issue on this appeal.

2. A dishpack is a standard size carton approximately 36" × 18" × 18", used in the moving industry for packing items such as dishes, lamps, and kitchenware.

A Mr. Briggs said he was parking the truck at 9:00 o'clock at night and Mr. Gaines said, I heard you come in. Mr. Briggs asked Mr. Gaines, where were you. He said, I was in the warehouse packing up this stuff and he pointed to the row of—the pile of dishpacks.

Q This is the pile of dishpacks that you referred to that were standing against the wall of the warehouse?

A Yes. These are two of them.

Q The two that you have identified here and the others?

A Yes, sir.

Q After Mr. Gaines said I was here packing up the stuff, what did Mr. Briggs say?

* * * * * *

A Mr. Briggs said, how come you don't open up the door. And Mr. Gaines told him, he says, Myron says don't open up the door for anybody, the warehouse door.

On Thursday, November 30, Flynn and Hamilton were sent home at approximately 7:45 a. m., but before they left they saw the dishpacks still stacked against the wall. Later that afternoon, when they returned to the warehouse to check on Friday's work schedule, they saw Briggs's truck being loaded. When they arrived at work on Friday, December 1, the dishpacks were gone.

Later that day, Flynn telephoned his cousin, Joseph Flynn, an F.B.I. agent in Los Angeles, to inform him that he suspected a shipment of marijuana was on its way to New York. Agent Flynn notified the DEA, which made arrangements that resulted in the arrests in Brooklyn on December 2.

Hamilton's testimony paralleled Flynn's to some extent since Hamilton was in the group of employees who heard the November 29 conversation quoted above, in which Gaines stated that Lieberman had told him not to open the door for anyone while he was packing dishpacks on the night of November 28.[3] Hamilton also testified that he asked Gaines what was in the dishpacks. Gaines's reply was, "Just a bunch of junk." When he later asked Lieberman, in full view of the 46 dishpacks, what the dishpacks were doing stacked against the warehouse wall, Lieberman responded, "What dishpacks?" and walked away.

On Monday, December 4, two days after the arrests in Brooklyn, Hamilton had two conversations with Lieberman. In the morning, when he entered Lieberman's of-

---

3. Hamilton described the conversation as follows:

Q Mr. Hamilton, what did you hear the defendant Willie Gaines say to Mr. Briggs and Briggs say to Gaines on the morning of the 29th?
A Briggs walked out of the office into the warehouse, came over by Willie and I were standing [sic].
Willie says, "How are you doing Briggs"—something to that effect. Briggs says, "All right."
Willie says, "I heard you come in last night."
Briggs says, "How could you have heard me come in? I didn't get in until around nine o'clock."
Q Did Mr. Gaines respond to that?
A Yes. He said, "I know," he said, "I was in the warehouse."

* * * * * *

Q What did Mr. Gaines say when Mr. Briggs said—
A He just said, "I heard you come in last night," and Briggs says, "I didn't get in until around nine o'clock."

Q What did Mr. Gaines say?
A He says, "Yeah, I know."
Q Then what did Mr. Gaines say?
* * * * * *
THE WITNESS: He just said—Briggs asked him, "Well, why didn't you come to the door," or something, and Willie says, "Myron told me not to unlock the door or go to the door for anybody."
Q Did Mr. Gaines say anything about what he'd been doing in the warehouse at nine o'clock the night before?
A Briggs asked what he was doing, and Willie pointed to the boxes and said, "Packing that stuff."
Q Are you referring to the dishpacks you testified about that were standing against the wall?
A Yes, sir.
Q Did there come a time during this conversation when you said something?
A Yes, sir.
I asked Willie, "What was in the boxes," and he said, "Just a bunch of junk."

fice to pick up his pay check, Lieberman shouted at Hamilton, "If you don't learn to shut your mouth . . . ," and stopped. Hamilton asked what Lieberman was talking about, to which Lieberman replied, "Nothing." Later, Lieberman called Hamilton into his office where he told him to close the door and turn up the radio; he apologized for having shouted at Hamilton, stating that he was upset because one of his best trucks had been seized in New York. Hamilton described the remainder of the conversation as follows:

Q And what if anything did he say after that?

A He told me that the D.A. would be down to talk to a few people around the warehouse. I asked him who the D.A. was. He said, "The Drug Administration."

Q And did he say anything else after that?

A No, I asked him what are they going to ask us. And he says, "Well, whatever they ask you," he says, "just tell them, you know."

Q What happened after that?

A I said, "Well, if they ask I will just tell them the truth."

And he said, "Yes."

And he has a fish on his wall. And he pointed to the fish on the wall and he asked me if I knew how the fish got caught.

Q What did you say?

A I said, "No, I didn't."

Q And what did he say?

A He said, "By opening up his mouth."

Q And was there anything further said during that conversation?

A No, sir. I just said, "Oh, well." [4]

In addition to the testimony of Flynn and Hamilton, the government introduced several documents. A shipping contract for 46 dishpacks, dated November 28, 1978, had been signed by Myron Lieberman and by consignee "Jaime Peters." The only ad-

dresses shown for Jaime Peters were the Lieberman Movers offices in Fort Lauderdale and Brooklyn; despite efforts by the DEA, Peters was never located. The shipment inventory prepared by Gaines bore the notation "PBO" which indicated that the dishpacks had been packed by the owner of the contents. The Government also introduced records from the Newport Resort Hotel in Miami Beach, Florida showing that someone using the name and address of Robert D'Ambra had registered as a guest at 9:44 p. m. on November 27, 1978, and that at 10:05 p. m. a telephone call had been placed from D'Ambra's room to the unlisted telephone number of Myron Lieberman.

For the defense, Lieberman called John Gibson, a co-worker of William Flynn, who testified that Flynn had stated that he was receiving $800 a month from the DEA while the case against Lieberman was pending, and that he would receive $10,000 when the case was completed. Gibson testified that Flynn had said he was "out to screw Myron Lieberman and his driver." Lieberman also introduced documents reflecting DEA payments to Flynn. Gaines called no witnesses and presented no evidence.

The jury found Lieberman guilty of the conspiracy charged; it found Gaines not guilty.

## II

Lieberman's principal contentions on this appeal are that the trial judge erred in allowing Flynn and Hamilton to testify to the conversation between Gaines and Briggs and in admitting the hotel registration card, and that even considering the challenged evidence, there was insufficient evidence to establish his participation in the conspiracy. We find no merit in any of his contentions.

### A. *Admission of the Hotel Record*

The government contends principally that the hotel guest registration card was admissible either under the business records ex-

---

**4.** On cross examination Hamilton described the tone of this conversation as "joking around," as he and Lieberman were "making up" after the morning's shouting incident.

ception to the hearsay rule or as non-hearsay evidence not offered for the truth of the matter reflected therein. We conclude that the card was properly admitted under the latter theory.

■ Fed.R.Evid. 803(6) permits the admission of a business record as evidence of the truth of the matters stated if it was made at or about the time of the event by a person with knowledge, and was made and kept in the course of a regularly conducted business activity.[5] Generally the record must either have been made by a person having firsthand knowledge of the facts recorded, or have been made on the basis of information supplied by a person having firsthand knowledge, whose business it was to make such a report.[6] The principal foundation of the trustworthiness of business records is the requirement that the information recorded be based upon firsthand observations of someone whose job it is to obtain the information. In light of the complexities of modern business, direct proof of actual knowledge of the person making the record or providing the information is not required, and the requisite

knowledge may be inferred from the fact that it was someone's business to obtain such information.

Evidence that it was someone's business duty in the organization's routine to observe the matter will be prima facie sufficient to establish actual knowledge. This does not dispense with the need for personal knowledge, but permits it to be proved by evidence of practice and a reasonable assumption that general practice was followed in regard to a particular matter.

*McCormick's Handbook of the Law of Evidence* 727 (2d ed. 1972); *e.g., United States v. Scallion*, 533 F.2d 903 (5th Cir. 1976), *cert. denied*, 429 U.S. 1079, 97 S.Ct. 824, 50 L.Ed.2d 799 (1977); *United States v. Pearson*, 508 F.2d 595 (5th Cir.), *cert. denied*, 423 U.S. 845, 96 S.Ct. 82, 46 L.Ed.2d 66 (1975).[7]

Lieberman's objection to the admission of the hotel guest card was that the lines showing the guest's name and address had been filled in by the guest, not the hotel's employee.[8] This objection missed the mark. We do not view the applicability of the

---

**5.** Rule 803(6) reads as follows:

(6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

**6.** We see no basis in the present record for inferring that D'Ambra's registration at the hotel was an act in the regular course of *his* business.

**7.** *Pearson* and *Scallion* were decided under the Federal Business Records Act, 28 U.S.C. § 1732(a) (1970), amended Pub.L. 93–595, § 2(b), 88 Stat. 1949 (1975), which was based on the Model Act and adopted by Congress in 1936 for use in federal courts. The differences

in construction between the Act and Fed.R. Evid. 803(6) are not significant and are not relevant to any issue in the present case. *See* 4 J. Weinstein & M. Berger, *Weinstein's Evidence,* ‡ 803–10, at 803–148–51 (1979).

**8.** The objection was as follows:

[MR. AIKEN] The record that the Government intends to introduce is the registration card. It is [an objection on grounds] of hearsay.

The Government's theory is that this is a business record and once the witness properly identifies it as a business record it automatically becomes admissible.

THE COURT: Yes.

MR. AIKEN: I would agree except for one thing, your Honor, if it is filled out by the hotel employee in the normal course of her duties it would be a business record.

But a gues[t] registration is not filled out by the hotel employees.

THE COURT: But if it is caused to be filled out by the hotel, by reason of filing it with the records, it still becomes a part of the business records.

There is no question about it.

MR. AIKEN: Okay. I just wanted to state my objection for the record.

business records exception as depending on the purely formal matter of whether the guest supplies the information by writing it on the card, or by stating it so that it may be written on the card by the employee. The latter process would not suffice to make the business records exception applicable to prove the identity of the guest unless the employee were able in some way to verify the information provided—for example, by examining a credit card, driver's license or other form of identification. *See* Note, *Revised Business Entry Statutes: Theory and Practice,* 48 Colum.L.Rev. 920, 927 (1948) ("The mere fact that recordation of third party statements is routine, taken apart from the source of the information recorded, imports no guaranty of the truth of the statements themselves.") By the same token, however, if such verification is obtained by the employee, we see no reason why the guest card that has been filled in by the guest himself would not qualify as a business record and thus be admissible for the truth of its statements. *See United States v. Pearson, supra.*

In the present case the government did not present any evidence that a hotel employee made any effort to verify the identity of the person who registered as D'Ambra; nor was there any testimony that it was the job of the registration clerk to verify a guest's identity. The guest cards themselves state that accounts must be paid in advance, a requirement that indeed might lessen the hotel's perceived need to verify a guest's identity. The card that was introduced here reflects that the required advance payment was made in cash. There is no indication that a credit card was inspected, nor any indication that a driver's license (for which there is a line on the card) was exhibited. We conclude, therefore, that the card was not properly admitted as a business record to prove that it was in fact the Robert D'Ambra who had been at Lieberman's offices earlier in the day, and who was eventually arrested,[9] who was the guest at the hotel.

The card was, however, admissible as non-hearsay, simply to show that someone calling himself Robert D'Ambra registered in the hotel, *see United States v. Scallion, supra,* 533 F.2d at 914–15, laying a foundation for further evidence that from his room a call was made to Myron Lieberman's unpublished telephone number. To provide evidence that the jury should infer that this D'Ambra was the person arrested on December 2, the government presented the testimony of the arresting DEA agent, Dennis Nargi, who testified to the address he had read on the driver's license carried by D'Ambra; this address was the same as that written on the hotel registration card. Thus it was proper to receive the hotel registration card for the limited non-hearsay purpose, with other evidence admitted from which the jury could infer that the hotel card spoke the truth.

To the extent that the hotel registration card was admitted for non-hearsay purposes, Lieberman was entitled, if he requested, to a limiting instruction. While the record is not entirely clear, it appears that Lieberman did not request such an instruction but that one was given nevertheless. After Nargi had testified to the address on D'Ambra's driver's license (the license itself not being offered or received in evidence), the court gave the following limiting instruction:

> This involves that registration piece of paper that was marked into evidence.
> Registration evidence offered to this Court was solely offered to prove that the Robert D'Ambra registered at the Florida Hotel was the same Robert D'Ambra arrested by the Agent Nargi. That's all. No other inference can be drawn from it.

**B.** *Admission of the Gaines-Briggs Conversation*

We have somewhat greater difficulty with the basis for the admission into evidence against Lieberman of the conversation between Gaines and Briggs. The government contends that the testimony as

---

**9.** Lieberman stipulated at trial that the D'Ambra who was arrested was the D'Ambra who had been in the Lieberman Movers office on November 27.

to this conversation was properly received against Lieberman as non-hearsay evidence because it was a conversation in furtherance of the conspiracy. *See* Fed.R.Evid. 801(d)(2)(E). We disagree, but we conclude that it was admissible under an exception to the hearsay rule.

 Before a coconspirator's statements are admissible against a defendant, the government must show that a conspiracy existed, that both the defendant and the declarant participated in it, that it was in existence at the time the statement was made, and that the statement was made in furtherance of the conspiracy. *United States v. Lyles*, 593 F.2d 182, 194 (2d Cir.), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979); *United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). We have no difficulty in upholding the district court's implicit determination that at the time of the conversation on November 29 a conspiracy existed and that Gaines, Briggs and Lieberman were members. The existence of such a conspiracy need be proven only by a preponderance of the evidence. *United States v. De Fillipo*, 590 F.2d 1228, 1236 (2d Cir.), *cert. denied*, 442 U.S. 920, 99 S.Ct. 2844, 61 L.Ed.2d 288 (1979); *United States v. Geaney, supra*, 417 F.2d at 1120. And when " 'the existence of a conspiracy has been shown, evidence sufficient to link another defendant with it need not be overwhelming....' " *United States v. Provenzano*, 615 F.2d 37, 45 (2d Cir.), *cert. denied*, 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980), quoting from *United States v. Head*, 546 F.2d 6, 9–10 (2d Cir. 1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977).

 Lieberman concedes that there was sufficient evidence to show the existence of a conspiracy between Caparella and D'Ambra. We conclude that there was sufficient evidence to show that Briggs, Gaines and Lieberman were also members of that conspiracy. This evidence included the visit of Caparella and D'Ambra to the Lieberman offices; D'Ambra's statement that he was to get dishpacks from Lieberman to conclude a little business deal involving a shipment to New York; the telephone call that night from a person calling himself D'Ambra to Lieberman at his unlisted home telephone number; D'Ambra's conversation with Briggs with regard to when the shipment would arrive in New York; Briggs's return from that conversation with his hand in his pocket, and his statement to Gaines that D'Ambra and Caparella were good payers; the distinctive Gaines taping style used in packing the dishpacks; the fact that the dishpacks were packed between the close of business one day and the opening of business the next; and Lieberman's conversations with Hamilton after D'Ambra, Caparella, and Briggs had been arrested, with regard to Hamilton's keeping his mouth shut. Clearly the evidence sufficed to link Lieberman with the existing conspiracy.

We are not persuaded, however, that the Gaines-Briggs conversation was "in furtherance of" the conspiracy. This conversation began with Gaines telling Briggs he had heard Briggs arrive at Lieberman Movers the night before; Briggs professed surprise because he had not arrived until 9 p. m.; Gaines stated he had been in the warehouse packing the dishpacks and that Lieberman had told him not to open the door for anyone. The conversation as thus described by both Flynn and Hamilton smacks of nothing more than casual conversation about past events. It is difficult to envision how it would have furthered the conspiracy. The government urges us to construe the conversation as "Gaines' way of indicating to his coconspirator Briggs that [Lieberman] thought secrecy to be imperative and that there should be no more discussion of the matter in the presence of other employees who were standing around the loading dock exhibiting curiosity about the 46 cartons stacked against the wall." (Brief on Appeal at 14.) We are unconvinced. First, we note that Gaines's statements in the conversation were entirely retrospective, especially as to Lieberman's instructions. Discussion, in the context of this conversation, of an instruction that related expressly

to a time since past does not appear to be intended to further an ongoing conspiracy. Moreover, as we read the testimony of Flynn and Hamilton, it was Gaines who initiated the conversation. And he did so with Hamilton standing next to him and other employees nearby. Neither Flynn nor Hamilton indicated that any conspiratorial air had been exhibited or that the employees were admonished not to be·inquisitive. If Gaines's goal had been to ensure that there be no discussion in the presence of the other employees, he could readily have achieved that simply by not starting the conversation.

The requirement that the statements have been in furtherance of the conspiracy is designed both to assure their reliability and to be consistent with the presumption that the coconspirator would have authorized them. *McCormick's Handbook of the Law of Evidence, supra*, at 645. The requirement is not satisfied by a conversation such as the one here, which amounted to no more than idle chatter. *United States v. Birnbaum*, 337 F.2d 490 (2d Cir. 1964); *see* 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 801(d)(2)(E)[01], at 801–174 (1979).

Since we have rejected the contention that Gaines's statements were made in furtherance of the conspiracy, the testimony by Flynn and Hamilton as to these statements must, insofar as Lieberman is concerned, be classified as hearsay.[10] We conclude, however, that the statements were admissible against Lieberman under an exception to the hearsay rule, as statements against Gaines's penal interest.[11]

■ Fed.R.Evid. 804(b)(3) provides that if a declarant is unavailable to testify, an exception to the hearsay rule permits the admission of "[a] statement which ... at the time of its making so far ... tended to subject him to civil or criminal liability ...· that a reasonable man in his position would

not have made the statement unless he believed it to be true." There is no question that Gaines was unavailable to testify. He was a defendant, and the government could not call him as a witness. *See* Fed.R. Evid. 804(a)(1).

■ Gaines's statement that he had packed the dishpacks was clearly self-incriminating, as those packages contained marijuana. Although Gaines's statement that Lieberman told him not to open the door for anyone, standing by itself, is less damaging, that statement too was self-incriminating, since it was probative of Gaines's knowledge of the furtive nature of his activities. Even if it were wholly neutral, however, it could constitute a statement against interest within the meaning of Rule 804(b)(3) since it was part and parcel of a larger conversation in which clearly self-incriminating statements were made: "it suffices for admission under that rule that a remark which is itself neutral as to the declarant's interest be integral to a larger statement which is against the declarant's interest." *United States v. Garris*, 616 F.2d 626, 630 (2d Cir.), *cert. denied*, 447 U.S. 926, 100 S.Ct. 3021, 65 L.Ed.2d 1119 (1980).

Although there are circumstances in which a self-incriminating statement may not in fact be against the declarant's interest—as for example, where it was made to a known government agent and was intended to relieve the declarant of criminal liability rather than to subject him to it, *see* discussion in *United States v. Garris, supra*, 616 F.2d at 631–32—no such circumstances existed here. The incriminating statements were made in the course of a conversation at Gaines's place of business, among employees for whom he was a foreman, and were volunteered in a conversation initiated by Gaines. Although Gaines may not have

---

10. As to Gaines, the statements attributed to him were admissions of a party and hence not within the definition of hearsay. Fed.R.Evid. 801(d)(2)(A).

11. We note that this basis for admission was not argued either at trial or on appeal. We

may, however, uphold the admission on any theory which finds support in the record, regardless of the ground relied on by the trial court. *Cf. Helvering v. Gowran*, 302 U.S. 238, 245–46, 58 S.Ct. 154, 157, 82 L.Ed. 478 (1937).

realized that he was subjecting himself to criminal liability simply by making these statements to his coconspirator Briggs, the statement was against his interest within the meaning of Rule 804(b)(3).

> The Rule does not require that the declarant be aware that the incriminating statement subjects him to immediate criminal prosecution. Rather, it simply requires that the incriminating statement sufficiently "*tended*" to subject the declarant to criminal liability "so that a reasonable man in his position would not have made the statement unless he believed it to be true."

*United States v. Lang*, 589 F.2d 92, 97 (2d Cir. 1978). Gaines's statements clearly tended to subject him to criminal liability, and there is no basis for supposing that he did not believe them to be true.

Further, we find evidence in the record to support the trustworthiness of the testimony as to Gaines's statements.[12] The statement that Gaines had, on the night of November 28, packed the dishpacks was corroborated by the observations of Flynn and Hamilton of the dishpacks not yet packed late on November 28 and packed at 7:30 a. m. on November 29, as well as by Flynn's testimony that the taping of the dishpacks was in Gaines's unique style. The statement as to Gaines's instructions from Lieberman implied that Lieberman knew what was going on and wanted the activity to remain confidential. This implication too is supported by other evidence in the record. First, the man calling himself D'Ambra had, after arranging for the dishpacks, telephoned Lieberman's home late at night, using his unlisted number. Although Lieberman argues that the record showing a telephone call of at most one minute's duration does not establish that the caller spoke to Lieberman himself and does not reveal what was discussed, any inferences available from the record of such a call were quite properly left to the jury and the jury was free to infer that Lieberman was

aware of what was going to be put in his dishpacks. Further, at approximately 7:30 a. m. on Thursday, November 30, Lieberman gave his keys to Hamilton to open the warehouse door, but kept the other employees outside; fifteen minutes later Lieberman sent home all of his employees except Gaines and one other person, and later that day the dishpacks were loaded onto Briggs's truck and taken away. Lastly, the tenor of Lieberman's two confrontations with Hamilton—first shouting at him about keeping his mouth shut; and later calling Hamilton into his office, instructing him to close the door and turn up the radio, before telling him that fish get caught by opening their mouths—bolsters the proposition that Lieberman had knowledge and desired secrecy.

In all the circumstances, we conclude that Gaines's statements were declarations against his penal interest, and that the testimony of Flynn and Hamilton as to those statements was admissible under Fed.R. Evid. 804(b)(3).

## C. *Sufficiency of the Evidence*

■ Finally, we conclude that the evidence was sufficient for the jury to convict Lieberman of conspiracy to possess and distribute the marijuana, and that Lieberman's motion for a judgment of acquittal was properly denied. The test for submitting a conspiracy count to the jury was articulated in *Curley v. United States*, 160 F.2d 229, 232–33 (D.C. Cir.), *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947), and is well established. *See, e.g., United States v. Provenzano, supra*, 615 F.2d at 45; *United States v. Stanchich*, 550 F.2d 1294, 1298 (2d Cir. 1977); *United States v. Rivera*, 513 F.2d 519, 528–29 (2d Cir.), *cert. denied*, 423 U.S. 948, 96 S.Ct. 367, 46 L.Ed.2d 284 (1975); *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972). The trial judge is required to determine

> whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw

---

**12.** Evidence as to any payments Flynn or Hamilton may have received from the government was available to allow the jury to assess the

credibility of these witnesses, but did not affect the admissibility of their testimony.

justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion .... If he concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter.

*Curley v. United States, supra,* 160 F.2d at 232–33.

Much of the proof against Lieberman has been reviewed in Part B above. Viewing the evidence, as we must, in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. McCarthy,* 473 F.2d 300, 302 (2d Cir. 1972), we conclude that it provided a basis upon which "a reasonable mind might fairly conclude guilt beyond a reasonable doubt."

### III

The sentence imposed on Lieberman included a special parole term of five years. Subsequent to the imposition of sentence and a few days after the filing of Lieberman's brief on appeal, the Supreme Court held, as the government has recognized in its brief on appeal, that 21 U.S.C. § 846 does not authorize imposition of a special parole term. *Bifulco v. United States,* 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980). Accordingly, we vacate Lieberman's sentence and remand for resentencing so that the special parole term may be deleted.

Conviction affirmed, sentence vacated, and remanded for resentencing.