47 F.3d 1166
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Sharon PENDERGRASS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Henry Monroe RAYFORD, a/k/a June Bug, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Waytis PENDERGRASS, a/k/a Grass, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jerome PENDERGRASS, a/k/a French Fry, Defendant-Appellant.
 Nos. 93-5422, 93-5738, 93-5423, 93-5425.
 United States Court of Appeals, Fourth Circuit.
 Argued: December 8, 1994.
Decided: February 7, 1995.
 
 ARGUED: Jon Rene Josey, Florence, SC, for Appellant Rayford; William Rhett Eleazer, ELEAZER LAW FIRM, Columbia, SC, for Appellant Sharon Pendergrass; Michael L. Brown, Jr., Rock Hill, SC, for Appellant Waytis Pendergrass; Lawrence J. Rosintoski, North Charleston, SC, for Appellant Jerome Pendergrass. Mary Gordon Baker, Assistant United States Attorney, Charleston, SC, for Appellee. ON BRIEF: J. Preston Strom, Jr., United States Attorney, Charleston, SC, for Appellee.
 Before MOTZ, Circuit Judge, MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation, and MESSITTE, United States District Judge for the District of Maryland, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Four criminal defendants bring this appeal following their respective convictions on charges arising out of a crack cocaine conspiracy. We affirm their conspiracy and possession convictions and the money laundering convictions of two defendants; however, due to the impact of hearsay documents erroneously admitted by the trial court, we reverse the money laundering conviction of one defendant.
 
 I.
 
 2
 In early 1989, Jerome Pendergrass began purchasing large quantities of powder cocaine and crack cocaine in Florida. Following each purchase, he or his wife, Sharon Pendergrass, would cook the powder into crack, and then transport the crack by bus or car to Jerome Pendergrass' brother, Waytis Pendergrass, in South Carolina. Waytis Pendergrass would arrange for the crack to be sold on the street by various individuals, including Henry Monroe Rayford. Frequently, Jerome Pendergrass would wire the cash proceeds from the crack sales in South Carolina to his wife, Sharon, in Florida. On other occasions, drug couriers from South Carolina would deliver the cash directly to Jerome and Sharon Pendergrass in Florida.
 
 
 3
 On April 24, 1992, a federal grand jury in South Carolina issued a 16-count indictment against several members of the crack organization, including Rayford and Jerome, Sharon and Waytis Pendergrass. The following day, federal drug enforcement agents executed a search warrant on the Florida home of Jerome and Sharon Pendergrass. Shortly thereafter, Rayford and the three Pendergrasses were arrested.
 
 
 4
 Following a jury trial in the United States District Court for the District of South Carolina beginning on November 2, 1992, Rayford and Sharon Pendergrass were each convicted of one count of conspiracy to possess with intent to distribute cocaine base and one count of money laundering. At the conclusion of that same trial, Waytis Pendergrass was also convicted of one count of conspiracy to possess with intent to distribute cocaine, as well as five counts of possession with intent to distribute cocaine. Jerome Pendergrass was tried separately and, at a second jury trial held in April, 1993, the jury convicted Jerome Pendergrass of one count of conspiracy to possess with intent to distribute cocaine and cocaine base, four counts of possession with intent to distribute cocaine, and one count of money laundering. All four of the defendants were sentenced to varying prison terms and thereafter filed timely notices of appeal.
 
 II.
 
 5
 Appellants first argue that the April 25, 1992, search of the Florida house violated the Fourth Amendment. More specifically, appellants contend that the search warrant was invalid because of its failure to describe with particularity the items to be seized. As appellants properly note, only those warrants "particularly describing the ... things to be seized" will be upheld under the Fourth Amendment. U.S. Const. Amend. IV. Appellants therefore challenge the description contained in the April 25 search warrant allowing federal agents to seize "documents relating to the transportation, distribution, and possession of controlled substances, specifically cocaine, a Schedule II controlled substance." Relying on this language, federal agents seized several photographs of the appellants and other members of the drug conspiracy, some of which show the subjects holding large sums of money.[1]
 
 
 6
 The purpose of the particularity requirement is to limit the discretion of the police in conducting a search or seizing items pursuant to a warrant. However, "the specificity required for a warrant varies with the circumstances within a 'practical margin of flexibility.' " United States v. Shilling, 826 F.2d 1365, 1369 (4th Cir.1987) (quoting United States v. Torch, 609 F.2d 1088, 1090 (4th Cir.1979), cert. denied, 446 F.2d 957 (1980)), cert. denied, 484 U.S. 1043 (1988). These practical considerations lead us to conclude that the language challenged by appellants is sufficiently specific to meet the requirements of the Fourth Amendment. The Fourth Amendment does not require drug enforcement agents to predict exactly what documentary evidence they will find upon executing a search. See id. Furthermore, by limiting the scope of the search to "documents relating to the transportation, distribution, and possession of controlled substances ...," the government sufficiently constrained the discretion of the agents conducting the search.
 
 
 7
 In a related argument, appellants also contend that the seizure of the photographs exceeded the scope of the warrant because the warrant does not specifically refer to photographs as being among the items to be seized. Although the warrant does not specifically mention that photographs are to be seized, the language referring to "documents relating to the transportation, distribution, and possession of controlled substances" can be fairly read to include any incriminating photographs. The First Circuit has concluded that a warrant allowing for the seizure of certain specified "records" can be properly interpreted to allow the government to seize certain photographs. United States v. Tabares, 951 F.2d 405, 408 (1st Cir.1991). Similarly, we conclude that the term "documents" in this case also includes any photographs relating to an alleged drug conspiracy. Certainly, the photographs seized from the Pendergrass home reasonably appear to relate to the "transportation, distribution, and possession of controlled substances...." Therefore, the photographs fell within the scope of the warrant issued in this case.[2]
 
 III.
 
 8
 Sharon Pendergrass alone presses the next argument. She contends that the district court erred in denying her motion for a new trial following a federal agent's comments during cross-examination. While being cross-examined by Sharon Pendergrass' attorney, Special Agent Samuel Harlan testified as follows:
 
 
 9
 [DEFENSE COUNSEL]: You said there wouldn't be a doubt if you took the drugs off that person, but there would be a doubt whether or not that person had knowledge that they were in the jacket that person were [sic] wearing that one time, is that correct?
 
 
 10
 MR. HARLAN: People are entitled to provide whatever explanation they choose when they are charged with a crime.
 
 
 11
 * * *
 
 
 12
 [DEFENSE COUNSEL]: You said if you took the drugs out of somebody's pocket, there wouldn't be a doubt in your mind as to the fact that they knew the drugs were there. I asked you if it was not their jacket and somebody else placed it there, wouldn't that create a doubt in your mind?
 
 
 13
 MR. HARLAN: I find that a difficult question to answer, because it hasn't been established that, no one showed me any evidence to prove that the jacket did not belong to Ms. Pendergrass.
 
 
 14
 At the close of Harlan's testimony, Sharon Pendergrass moved for a mistrial, asserting that Harlan's responses had implied that she carried the burden of proving her innocence with regard to crack cocaine discovered on her person following her arrest. Sharon argued that Harlan's testimony violated her Fifth Amendment right to remain silent. The district court denied the motion for a mistrial, but immediately gave the jury the following curative instruction:
 
 
 15
 Ladies and gentlemen, with respect to the comments that were made by this last witness regarding his opinion of the defendant's explanation, I would instruct you that a defendant has an absolute right not to present any testimony or any evidence. They have an absolute right not to testify. The burden is not upon the defendant to prove anything. The burden is always upon the government to prove guilt, if they can do so, beyond a reasonable doubt. The burden is never upon a defendant to prove anything or offer any testimony or offer any explanation.
 
 
 16
 Sharon never testified at her trial. On appeal, she again argues that the trial court erred in refusing to grant a mistrial, asserting that the two responses quoted above violated her rights under the Fifth Amendment. A statement does not contravene the Fifth Amendment unless it is such that the jury would naturally regard the statement as a comment on the defendant's decision to remain silent. United States v. Lorick, 753 F.2d 1295, 1298 (4th Cir.), cert. denied, 471 U.S. 1107 (1985).
 
 
 17
 With respect to Harlan's first response, his testimony is too general and too vague to constitute an impermissible characterization of the burden of proof. The second statement, however, presents a closer question. Even if it could be interpreted as an improper comment on Sharon Pendergrass' failure to testify in her own defense, which was made on behalf of the government,[3] the trial judge's curative instruction adequately remedied any impermissible implication. "[B]efore granting a mistrial, the court should always consider whether the giving of a curative instruction or some alternative less drastic than a mistrial is appropriate." United States v. Martin, 756 F.2d 323, 328 (4th Cir.1985). Immediately following Harlan's second response, the trial judge gave the jury a thorough and accurate instruction as to a defendant's right to remain silent and the proper burden of proof in a criminal case. Furthermore, there is no reason to believe that the jury misunderstood the district court's instructions. Greer v. Miller,
 
 
 18
 483 U.S. 756, 766 n. 8 (1987). This curative instruction was an appropriate remedial measure in light of the circumstances and it obviated the need for declaring a mistrial. Therefore, no error was committed in the district court's refusal to grant Sharon Pendergrass' motion for a mistrial.
 
 IV.
 
 19
 Appellants next argue that the trial court erred in admitting certain hearsay evidence at trial and that this error requires reversal of all convictions. At both trials, there was testimony that drug dealers often wire drug money and so the government was permitted to introduce Western Union documents showing that on numerous occasions from June, 1990, through March, 1992, appellants used Western Union to send or receive large amounts of money. The government concedes that the Western Union records evidencing these transactions are hearsay but asserts that the records were properly admitted under the business records exception to the hearsay exclusion. See Fed.R.Evid. 803(6).
 
 
 20
 The evidence at trial demonstrated that, in order to send money via Western Union, a customer must first appear at a Western Union office and complete a "send" form. The completed send form is then given to a Western Union agent, along with the appropriate sum of money. At this point, the agent enters the information supplied on the send form by the customer into the Western Union computer system. On the other end of the transaction, the recipient of the money also must appear at a Western Union office and complete a "receive" form. The completed receive form is then handed to a Western Union agent who verifies the transaction on the company's computer system and issues the recipient a check. No identification is required to send money through Western Union, but in order to receive money, the recipient must state who is sending the money, where the money is coming from, the amount of money expected, and must either present identification or respond correctly to a "test question," which has been formulated by the sender.
 
 
 21
 Western Union retains both the send and receive forms, as well as the computer-generated versions of the transaction, in the ordinary course of its business. However, the substance of the information contained in these documents is provided by the senders and recipients of money at Western Union. With respect to the send and receive forms, the customer provides his or her name, address, and telephone number. The only information on these forms provided by a Western Union employee is the time of the transaction, the control number and the total charge. Similarly, while the computer-generated records are in fact entered by a Western Union employee, the information contained therein is derived from the information on the send and receive forms. At both trials, testimony was elicited from Western Union employees outlining these procedures, and computer-generated Western Union records, as well as the send and receive forms, were introduced into evidence.
 
 
 22
 All of these documents are clearly hearsay as they were offered by the government to prove that appellants laundered the proceeds of their drug sales by wiring the money through Western Union. In other words, the computer records and the send and receive forms were being offered for the truth of the matter asserted. Fed.R.Evid. 801(c); United States v. McIntyre, 997 F.2d 687, 701 (10th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 736 (1994). Thus, in order to be admissible, these documents must fall within an exception to the general hearsay exclusion. Appellants assert that none of them do so.
 
 
 23
 Federal Rule of Evidence 803(6) provides that the rule excluding hearsay from evidence does not apply to:
 
 
 24
 A memorandum, report, record or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness.
 
 
 25
 Fed.R.Evid. 803(6).
 
 
 26
 The information on these records supplied by a Western Union employee--the time of the transaction, etc.--is clearly admissible under the business records exception. The problem arises with regard to the information supplied by outside sources. "If any person in the process is not acting in the regular course of business, then an essential link in the trustworthiness chain fails, just as it does when the person feeding the information does not have firsthand knowledge." 2 McCormick on Evidence, Sec. 290, at 274 (4th ed.1992). When the source of the information in the business record is an outsider, the only way to save the record from the jaws of the hearsay exclusion is to establish that the business recipient took precautions to guarantee the accuracy of the given information. McIntyre, 997 F.2d at 700; United States v. Patrick, 959 F.2d 991, 1001 (D.C.Cir.1992). Thus, Western Union must have been "able in some way to verify the information provided--for example, by examining a credit card, driver's license or other form of identification." United States v. Lieberman, 637 F.2d 95, 101 (2d Cir.1980).
 
 
 27
 As indicated above, the record shows that Western Union employees did take steps to verify the identity of the recipients of money transfers. In order to obtain the money, the recipient must know the amount to be paid and the name of the sender, and must produce the test answer or some identification to establish his or her identity. Here the record indicates that the recipient always displayed his or her driver's license. Because this step was taken to verify the identity of the recipients, the receive forms have some basic guarantee of trustworthiness and so were admissible under Rule 803(6). McInytre, 997 F.2d at 701; United States v. Zapata, 871 F.2d 616, 625-626 (7th Cir.1989).
 
 
 28
 On the other hand, no similar measures were taken to insure the accuracy of the information on the send forms supplied by customers sending money, e.g., the sender's name and address. We therefore conclude, as has the Tenth Circuit, that the send forms do not demonstrate sufficient trustworthiness to bring them within the bounds of Rule 803(6). McIntyre, 997 F.2d at 701. Furthermore, since Western Union's computer-generated records based on those send forms also contain unverified information provided by customers, those computer records constitute double hearsay failing to qualify for the business records exception.[4] Although the send and computer-generated documents do not come within the business records exception, they will nonetheless be deemed to have been properly admitted by the trial court if any other basis for admissibility exists. See United States v. Moore, 748 F.2d 246, 248 (5th Cir.1984). However, none of the remaining exceptions to the hearsay exclusion apply, nor does the government raise an alternative theory of admissibility. Since the government offered the send records to prove the names and addresses of the senders, the district court abused its discretion when it allowed these records to be admitted into evidence. United States v. Ham, 998 F.2d 1247, 1252 (4th Cir.1993). Having found error in the admission of the send form records, we now proceed to the question of whether that error requires reversal of any conviction.
 
 
 29
 Rayford, Sharon Pendergrass, and Jerome Pendergrass were convicted of money laundering. In order to prove a defendant has engaged in money laundering, the government must show that the defendant: (1) conducted a financial transaction affecting interstate commerce and involving the proceeds of specified illegal activity; (2) did so knowing that the transaction was designed in whole or in part to disguise the nature, source, ownership or control of the proceeds; and (3) knew that the property involved in the transaction was derived from illegal activity. United States v. Baker, 985 F.2d 1248 (4th Cir.1993), cert. denied sub nom. Blackwell v. United States, --- U.S. ----, 114 S.Ct. 682 (1994); 18 U.S.C. Sec. 1956(a)(1)(B)(i).
 
 
 30
 With regard to Rayford, the only evidence introduced at trial as to the first element--that he conducted a financial transaction affecting interstate commerce--was the Western Union documents. Moreover, the only Western Union documents implicating Rayford were four send forms and the computer documents generated from them. There was no testimony from any Western Union employee identifying Rayford as a sender or recipient of money and he is not named on any receive form. Accordingly, even viewing the remaining evidence in the light most favorable to the government, no reasonable jury could have found Rayford guilty of money laundering beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Thus, the error in admitting the send documents was not harmless as to him and so his conviction on the money laundering charge must be reversed.
 
 
 31
 With respect to Sharon Pendergrass, send records involving one transaction were improperly admitted. However, an enormous number of the properly admitted, independently verified, receive records show her to be the recipient of wire transfers. Of the forty-four transactions represented by Western Union documents introduced at her trial, in thirty-eight Sharon Pendergrass is the named recipient of the cash. In order to obtain the money, she supplied her Florida driver's license for identification. In fact, many of those receive records include a photocopy of the license, complete with Sharon Pendergrass' photograph. Moreover, the government also offered the testimony of a Western Union employee who observed Sharon Pendergrass retrieving wire transfers one to three times a week over a period of three years, and who assisted her with transactions at a Western Union outlet in Fort Lauderdale, Florida. Thus, an overwhelming amount of properly admitted evidence connected Sharon Pendergrass to the money laundering scheme. In light of this evidence, we can hardly conclude that the improper admission of the documents evidencing a single send transaction requires reversal of her money laundering conviction. Rather admission of those send documents was clearly harmless error as to Sharon.
 
 
 32
 Although not mentioned in the briefs of either the appellants or the government, Jerome Pendergrass' challenge to the Western Union evidence is a much narrower one. This is so because his trial counsel specifically waived any objection to any Western Union form with Jerome's name on it, conceding that if "Jerome Pendergrass' name is on it, I guess we're kind of stuck with it." At least five of the properly verified receive forms and six of the hearsay send forms and the computer documents generated from them name Jerome as the recipient or sender.[5] Because of trial counsel's concession, Jerome has preserved no objection to any of those documents--not even the send documents. Moreover, when Jerome testified at his trial, he conceded that he had sent and received money as indicated on the documents bearing his name: "I'm going to admit I sent that, because I can't get out of that. If that's my signature, that's my signature." Jerome's only objection to the hearsay character of the Western Union documents in the trial court--and so the only objection to them as hearsay that is preserved for appellate review--concerned several documents indicating that John or Larry Brown sent money to Sharon Pendergrass. Three different Western Union employees identified Jerome Pendergrass as a person who frequently (as much as five or six times a month from May, 1991, to March, 1992) used Western Union to wire money. Two of these employees identified him as a person who often used the names of John Brown or Larry Brown when so doing. Moreover, one employee was even able to identify a specific send document in which Larry Brown is listed as the sender as one that Jerome Pendergrass, in fact, signed and used to wire money. The jury was able to compare Jerome's signature on the send documents that he conceded he sent with the markedly similar signatures of John Brown and Larry Brown on the send documents bearing their names. For all of these reasons, there may not have been any error but there was certainly no reversible error in admitting the John Brown and Larry Brown send documents.
 
 
 33
 We note that Jerome testified that he did not use the names John Brown or Larry Brown to wire money. He insisted that John Brown and Larry Brown were his wife's brothers, were "real close to her", and had wired her the money. Jerome sought to explain away the Western Union employees' identification of him by asserting that he and one or both of the Browns "looked just like twins." However, Jerome acknowledged that the addresses used by John and Larry Brown were Jerome's sisters' homes. Jerome did not assert that John or Larry Brown was married to, or living with, his sisters; indeed,
 
 
 34
 Jerome acknowledged that on occasion, he lived with his sisters. Jerome also first testified that he was with John Brown at the Western Union office on the day the clerk identified Jerome as signing Larry Brown's name; upon realizing he had named the wrong Brown, Jerome changed his story. The jury considered all of this testimony and apparently concluded that Jerome was not credible. In our view, that conclusion is entirely warranted.[6]
 
 
 35
 As for appellants' remaining convictions of conspiracy and substantive drug offenses, any error in admitting the send documents was harmless. Fed.R.Crim.P. 52(a). The improperly admitted evidence comprised only a small portion of the voluminous evidence supporting appellants' conspiracy and possession convictions. Thus, there is no basis for vacating any conspiracy or possession conviction.
 
 V.
 
 36
 Jerome Pendergrass next argues that the equation of one gram of cocaine base or crack to one hundred grams of cocaine powder as set forth in the United States Sentencing Guidelines amounts to a violation of equal protection, as well as cruel and unusual punishment. With respect to the equal protection challenge, Jerome, who is African-American, contends that the majority of defendants convicted of crack cocaine offenses are black, while the majority of defendants convicted of powder cocaine offenses are white. Accordingly, he argues that the disparate treatment of cocaine base and cocaine powder under the Sentencing Guidelines violates the Equal Protection Clause of the Fourteenth Amendment, as incorporated into the Fifth Amendment. See Bolling v. Sharpe, 347 U.S. 497, 499 (1954).
 
 
 37
 This Court has on several previous occasions addressed the same equal protection challenge to the 100-to-1 ratio of powder cocaine to cocaine base under the Sentencing Guidelines. On each occasion, we have concluded that the Sentencing Guidelines' harsher treatment of crack cocaine offenses does not violate the Equal Protection Clause. United States v. Jones, 18 F.3d 1145, 1151 (4th Cir.1994); United States v. D'Anjou, 16 F.3d 604, 612 (4th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 2754 (1994); United States v. Bynum, 3 F.3d 769, 774 (4th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 1105 (1994); United States v. Thomas, 900 F.2d 37, 39-40 (4th Cir.1990). Nothing in Jerome Pendergrass' argument persuades us to stray from this line of precedent.[7]
 
 
 38
 Jerome further contends that the severe treatment of cocaine base offenders violates the Eighth Amendment's ban on cruel and unusual punishment. Again, however, this argument has been raised before and has been rejected. Thomas, 900 F.2d at 39-40; see also Harmelin v. Michigan, 501 U.S. 957, 994 (1991) (state mandatory sentencing provision punishing crack dealers with life imprisonment does not violate Eighth Amendment).
 
 VI.
 
 39
 Finally, Jerome Pendergrass argues that the district court erred in denying his motions for judgment of acquittal and judgment as a matter of law. He contends that the evidence presented against him to support the crack cocaine possession convictions was "unbelievable as a matter of law." He therefore asserts that the record contains legally insufficient evidence to uphold the four possession convictions.
 
 
 40
 We do not review the credibility determinations of the jury. United States v. Arrington, 719 F.2d 701, 704 (4th Cir.1983), cert. denied, 465 U.S. 1028 (1984). If the jury chooses to believe one witness over another, we are bound by that choice. United States v. Saunders, 886 F.2d 56, 60 (4th Cir.1989). Because of its unique ability to assess the appearance and demeanor of a witness, we do not endeavor to overrule the jury's conclusions as to a witness' credibility.
 
 
 41
 Reliance on United States v. Van Wyhe, 965 F.2d 528, 531 (7th Cir.1992), is unavailing. There, the court merely held that if a conviction rests solely upon the uncorroborated testimony of an accomplice, it will be upheld on appeal unless the testimony of the accomplice is incredible as a matter of law. At trial, two of Jerome's accomplices, Frank Black and Larry Tisdale, testified about travelling together on several occasions from Kingstree, South Carolina, to Fort Lauderdale, Florida, at the direction of Waytis and Jerome Pendergrass. Once arriving in Florida, Black and Tisdale would deliver the profits from previous crack sales to Jerome or Sharon Pendergrass and would pick up more crack to be sold on the streets of Kingstree. While the testimony of Black and Tisdale contains a few minor inconsistencies,[8] we find no basis in the record for concluding that their testimony is unbelievable as a matter of law. See United States v. Manbeck, 744 F.2d 360, 392 (4th Cir.1984), cert. denied sub nom. O'Hare v. United States, 469 U.S. 1217 (1985). Furthermore, the record contains additional corroborating evidence to support Jerome Pendergrass' possession convictions. Clearly, there is sufficient evidence to support these four possession convictions. United States v. Samad, 754 F.2d 1091, 1096 (4th Cir.1984).
 
 VII.
 
 42
 For the reasons stated above, we reverse Henry Monroe Rayford's conviction of money laundering. We affirm all other convictions.
 
 AFFIRMED IN PART, REVERSED IN PART
 
 
 [1]
 We note that Rayford and Waytis Pendergrass do not have standing to challenge the seizure of these photographs under the Fourth Amendment. See Rawlings v. Kentucky, 448 U.S. 98, 105 (1980); Rakas v. Illinois, 439 U.S. 128, 133-134 (1978). However, as the ostensible residents of the house that was searched, Sharon and Jerome Pendergrass do have standing to challenge the seizure
 
 
 [2]
 As a final basis for excluding the photographs from evidence, Jerome Pendergrass alone asserts that the photograph marked 52-B was not relevant and therefore should not have been admitted into evidence at his trial. The government concedes that none of the witnesses at Jerome's trial identified the subject holding a large amount of cash in photo 52-B as Jerome Pendergrass, but maintains that the matter of identifying the person in the photo is one properly left to the jury. We agree. Despite Jerome's contention that the photo was actually taken while he was in prison and, therefore, was not relevant to establishing his involvement in the conspiracy, the trial judge did not abuse his discretion in admitting the photo. See United States v. Zandi, 769 F.2d 229, 237 (4th Cir.1985). The judge properly concluded that, because the photo was seized from the house where Sharon Pendergrass was living, the photo was relevant for the purpose of corroborating prior testimony establishing Jerome Pendergrass' connection to the residence. See Fed.R.Evid. 401
 
 
 [3]
 Harlan made this improper comment on cross-examination by the defense. However, it was not responsive to the question posed and so might be considered to have been made on behalf of the government, rather than to have been elicited by the defense
 
 
 [4]
 Only the Tenth Circuit appears to have faced the precise issue of the admissibility of Western Union send and receive forms, see McIntyre, 997 F.2d at 701; however, other circuits have reached the same conclusion regarding the introduction of records similar to those introduced in this case. See Patrick, 959 F.2d at 1001-1002 (sales receipt inadmissible to prove defendant's address where address on receipt was supplied by customer and not verified by store); Lieberman, 637 F.2d at 100-101 (hotel registration card containing a name and address inadmissible to show that the individual identified on card had stayed at hotel because hotel failed to verify name and address)
 
 
 [5]
 Actually, many forms indicate that Jerome Pennygrass was the sender. However, several Western Union clerks, and Jerome himself, conceded that he was Jerome Pennygrass. Indeed, his license, a photocopy of which is attached to several of the receive forms, is in the name Jerome Pennygrass
 
 
 [6]
 Appellants' alternative argument that all the Western Union records were irrelevant because there was no testimony that the transactions they evidenced "were in anyway related to drugs" is meritless. There was evidence that Jerome Pendergrass had no legitimate employment during the period of the alleged conspiracy and that he and Sharon never filed tax forms--further evidence of lack of legitimate income. There was also abundant evidence of a thriving drug business in which they engaged. Evidence of a defendant's lack of legitimate income, when combined with evidence of a defendant's drug trafficking and use of wire services to transfer money, is sufficient to sustain a conviction for money laundering. United States v. Blackman, 904 F.2d 1250, 1257 (8th Cir.1990)
 
 
 [7]
 Jerome Pendergrass also contends that the use of the term "cocaine base" in the Sentencing Guidelines is unconstitutionally vague. Other circuits have concluded that this argument is without merit. United States v. Levy, 904 F.2d 1026, 1033 (6th Cir.1990), cert. denied sub nom. Black v. United States, 498 U.S. 1091 (1991); United States v. Barnes, 890 F.2d 545, 553 (1st Cir.1989); United States v. Williams, 876 F.2d 1521, 1525 (11th Cir.1989); United States v. Collado-Gomez, 834 F.2d 280, 281 (2d Cir.1987), cert. denied sub nom. Quintero-Gonzalez v. United States, 485 U.S. 969 (1988); United States v. Brown, 859 F.2d 974, 976 (D.C.Cir.1986). We reach the same conclusion. Furthermore, any argument as to vagueness in the term "cocaine base" is foreclosed by the commentary to the Sentencing Guidelines, which states that "cocaine base" is synonymous with the term "crack." United States Sentencing Commission, Guidelines Manual, Sec. 2D1.1 (1994)
 
 
 [8]
 For example, during one trip, Black and Tisdale were stopped by the police while driving on the highway. At trial, Tisdale mentioned that, during the stop, a police dog was summoned to search the car. When describing the same incident, Black made no reference to a police dog. This alleged inconsistency is inconsequential